# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **Don Firenze** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION NO.** |
| ) | |
| **National Labor Relations Board** ) | |
| ) | |
| **and** ) | |
| ) | |
| **National Labor Relations Board Union** ) | |
| ) | |

## COMPLAINT

### PARTIES

1. The plaintiff, Don Firenze, is a resident of Cambridge, County of Middlesex, Massachusetts and a citizen of the United States.

2. Defendant National Labor Relations Board is a federal agency. It has a "Board-side," which is its judicial arm, and a "General Counsel-side," which is its prosecuting arm. Hereafter, the former will be called "the Board" and the latter, "the Agency." The legal disputes which are the subject of the instant complaint arise out of a series of labor disputes concerning the plaintiff during the course of his employment in the Boston office (hereafter, Region One) of the Agency. The territorial jurisdiction of Region One consists of all the New England states except Connecticut. The headquarters of the Agency is located at:

1099 14th Street, N.W.
Washington, DC 20570

3. Defendant National Labor Relations Board Union (hereafter, the NLRBU or the Union) is a labor organization which represents the rank-and-file attorneys, field examiners, and clerical employees of the Agency. The Union is an in-house union, that is, all its officers are employees of the Agency. The Union does not have its own office or address. The President and CEO of the Union, Burt Pearlstone, may be contacted:

> C/o Region 2, National Labor Relations Board
> 26 Federal Plaza – Suite 3614
> New York, New York 10278-0104

4. The defendants are properly joined pursuant to FRCP 20 (a) (2) (B) because with respect to both of them Plaintiff must prove that the Union breached its duty of fair representation toward Plaintiff in this so-called "hybrid action" within the meaning of *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed. 2d 842 (1967).

## JURISDICTION

4. (a) This court has jurisdiction over the claims against the Agency set forth in Count 1, below, pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702;

(b) This court has jurisdiction over the claim against the Agency set forth in Count 2, below, pursuant to 28 U.S.C. § 1331;

(c) This court has jurisdiction over the claim against the Union set forth in Count 3, below, pursuant to 28 U.S.C. § 1331 or, alternatively, 28 U.S.C. § 1367.

## VENUE

5. Venue in this court is proper pursuant to 28 U.S.C. § 1391(e).

## FACTS

6. Plaintiff has worked as an attorney for the Agency since April 1976. His 2001 annual evaluation describes him as "extremely intelligent and perceptive." His case-handling

productivity has always been on the order of twice that of anyone else in Region One. Until he

accused the head of Region One, Regional Director Rosemary Pye, of unethical conduct in the

*Classic Lath* case on January 5, 2008, plaintiff had never been disciplined. However, on

February 17, 2009, plaintiff was given a written warning allegedly for dragging his feet in

drafting injunction papers in connection with this self-same case. This was after he had

requested to be removed from it because he considered the complaint to be clearly time-barred

and could not ethically represent to the federal district court that there was a reasonable basis for

thinking that the case, which had yet to be reduced to final judgment, was meritorious.

Thereafter, plaintiff was given another warning and three suspensions, all in connection with

other, unrelated case-handling matters.

7. *Classic Lath* was a so-called "runaway shop" case in the construction industry. In

2001, Octavio Fragata, the owner of Classic Lath, a drywall contractor, had voluntarily

recognized the Carpenters as the exclusive representative of Classic Lath's employees and

adopted the existing Carpenters' multi-employer collective bargaining agreement. As is lawful

in the construction industry pursuant to Sec. 8(f) of the National Labor Relations Act, 29 U.S.C.

§§151-169 (hereafter, the Act), Fragata did this even though at the time the Carpenters did not

enjoy majority support among Classic Lath's employees. By the beginning of 2003, the

Carpenters became aware that Fragata was doing drywall jobs under names other than Classic

Lath and failing to pay the wages and fringe benefits of the union contract on these jobs. The

Carpenters tolerated this unlawful state of affairs until, in the spring of 2005, Fragata failed to

cease doing business with another employer with whom the Union had a labor dispute on a

project in Tiverton, R.I. In retaliation for what the Carpenters considered to be Fragata's

treacherous return for its tolerance of his operating on a non-union basis whenever he pleased,

the Carpenters filed an unfair labor practice charge against Classic Lath on August 8, 2005, alleging that Classic Lath had repudiated the collective bargaining agreement by operating through *alter ego's* without paying the contractual wages and fringe benefits.

8. Since, as noted, the bargaining relationship between Classic Lath and the Carpenters was entered into at a time when the latter did not enjoy majority support among the former's employees, that relationship is deemed by the Board to end with the defeasance of the collective bargaining agreement, that is, upon this contingency, the employer has no further duty to recognize the union as the representative of its employees. The Act has a six months statute of limitations. Since the Carpenters had knowingly permitted Classic Lath to operate on a non-union basis for approximately two-and-a-half years, the charge was time-barred and should have been dismissed. However, Fragata's attorneys were not familiar with the Act and never raised the timeliness issue during the investigation of the charge. Although the Agency's case-handling manual requires that its regional offices investigate on their own initiative the issue of the timeliness of a charge as a threshold matter, Region One failed to do this and, as a result, issued a complaint on the charge on December 21, 2005.

9. Originally, the trial date was set for April 3, 2006. However, the hearing date kept being postponed as Fragata established a new disguised continuance as soon as the Union had discovered the previous one and Pye kept investigating whether this new entity was indeed Classic Lath in yet another incarnation. This process only came to an end when Fragata transferred his drywall operations to Florida, which is outside the territorial jurisdiction of the Carpenters' collective bargaining agreement. As a result, the hearing in the case only took place on September 22-23, 2008. This delay was completely unnecessary since an employer and its *alter ego's* are deemed to be but a single legal entity and the Agency bifurcates its hearings into a

4

hearing on the merits and a subsequent hearing on the remedy, if one is necessary. Thus, the proper way to proceed in a construction industry runaway shop case is to hold the Agency hearing without delay after the first *alter ego* has been detected and handle any subsequent *alter ego* matters in an remedial proceeding before the Agency or in an enforcement or injunctive proceeding in federal court, as appropriate.

10. In an amended answer to the complaint dated April 25, 2006, Fragata's attorneys, among other things, pleaded "the Affirmative Defense of Statute of Limitations." This defense was apparently pleaded *pro forma* because Fragata's attorneys never raised the matter orally with the Region. In any event, the Region even now failed to consider this defense.

11. Runaway shop/*alter ego* cases in their essence involve deception by the employer: first, to avoid detection by the union; second, upon discovery, to hid assets to avoid backpay liability. (Region One estimated that Fragata, who was named personally as a defendant, had a backpay liability of approximately $700,000.00, exclusive of interest.) Accordingly, the Agency's case-handling manual requires the regional offices to "immediately" seek a protective order from a federal district court sequestering sufficient of the employer's assets to satisfy the anticipated judgment in a runaway shop/ *alter ego* case like *Classic Lath*. However, Pye ignored this requirement for almost three years until, on October 2, 2008, she gave Plaintiff the assignment to seek the protective order. By this time, the two-day hearing in the case had closed and the briefs to the administrative law judge were not yet due. Plaintiff's written instructions for his assignment say:

> As a practical matter, much of the factual predicate for the assignment we are giving you will be set forth in the trial brief for the cases we have just tried. As we have not yet received the transcript, obviously [the] brief has not yet been written, and I want to make very clear that I do not want you talking to Susan Lawson or Emily Goldman [the trial attorneys] about any aspect of this case until they

have drafted the brief; moreover, if they need the second copy of the trial transcript, you[r] need for it must yield to theirs.

12. Plaintiff was on sick leave with a shattered writing arm from October 12, 2008 until October 27, 2008. He only obtained access to the transcript in *Classic Lath* on October 31, 2008.

13. On November 19, 2008, Plaintiff submitted to Pye a legal memorandum, including case citations, demonstrating that the charge in *Classic Lath* was time-barred. On November 20, 2008, Plaintiff's immediate supervisor, Scott Burson, saying that he was speaking for Pye not himself, informed Plaintiff that he had acted wrongfully in concerning himself with the timeliness issue without being instructed to do so. This in fact is contrary to announced Agency policy, which requires Agency attorneys to bring legal problems with trial cases to the attention of management whenever they become aware of them. More importantly, it is contrary to the requirements of legal ethics, since an attorney must certify to the district court when he is seeking an injunction in a case which has yet been reduced to final judgment that he personally believes that there are reasonable grounds for thinking the case meritorious.

14. Before a regional office of the Agency may seek an injunction, it must first get authorization from the Board in Washington. The case-handling manual requires that the request for authorization "[d]etail the facts and legal theories regarding the violations alleged, including responses to defenses raised by the respondent." Part of Plaintiff's *Classic Lath* assignment was to draft this request. At the November 20, 2008 meeting between Plaintiff and Burson referred to in paragraph 13, above, Burson instructed Plaintiff to prepare the authorization request by December 10, 2008. When Plaintiff asked if the plan had not been for him to take the factual recitation and legal analysis from the as yet uncompleted brief to the administrative law judge, Burson instructed Plaintiff to write up what he regarded as the relevant facts and appropriate

legal argument, adding that if it proved that the brief did not rely on the same facts or present the same analysis Plaintiff would have to rewrite the request to conform to the brief.

15. On November 21, 2008, Burson e-mailed Plaintiff, "We will wait for the trial brief, and adapt its statement of facts and legal analysis of the violation." This e-mail concluded, "If you have any questions about this assignment, including any issues relating to the limitations in scope of this assignment, please talk with me."     On November 24, 2008, Plaintiff sent supervisor Burson a memo asking if the untimeliness issue should be discussed in the request for authorization. No reply was ever made to this inquiry.

16. On November 24, 2008, Plaintiff informed Pye in writing that after consultation with the Massachusetts Board of Bar Overseers he was requesting to be removed from the *Classic Lath* case because he lacked a good faith belief that it was meritorious. Pye refused this request. This was the first time in Plaintiff's then 32+ years with the Agency that he had asked to be removed from a case.

17. In a November 25 e-mail, Burson instructed Plaintiff that:

...the factual recitation and the legal analysis...will be drawn from the trial brief. You are specifically instructed to wait for these materials, and take no action to develop them yourself.

18. Within about a week of November 20, 2008, Burson told Plaintiff, without explanation, "Forget about the December 10 deadline."

19. The trial brief was only completed on Thursday, December 18, 2008.

20. Under the Act, a defendant need only plead untimeliness in its answer to properly raise this affirmative defense and, as noted, Fragata's attorneys had done this. At the hearing and thereafter, Fragata was a *pro se* defendant. At the hearing, neither the administrative law judge nor the parties had evidenced the slightest awareness that a defense of untimeliness had been

7

raised in the case. Fragata did not mention the issue in his "brief." Although in response to my

November 19, 2008 legal memorandum Pye had appointed her most able supervisor, Robert

Redbord, to research the timeliness issue, he apparently failed to find any cases to support the

conclusion that the charge was timely. In any event, Region One's trial brief cited no cases on

the issue and only addressed the issue in but a *portion* of a single footnote in an inapposite,

preliminary, and "boilerplate" section of the brief in the obvious hope that the administrative law

judge would neglect to read it, just as he had apparently thus far overlooked the fact that a

defense of untimeliness had been raised in the answer. The Agency will not be able to produce

even a single Agency brief which only addresses a colorable defense of untimeliness in a

footnote lacking any case authority, rather than in a separate section of the brief with a full-

blown discussion of the issue supported by case authority. Pye had to know that if the

administrative law judge did in fact read this footnote, he would, in the circumstances,

understand it as a tacit admission that the charge was time-barred and a covert plea that he find

against Fragata in spite of this fact.

21. From December 24, 2008 until January 5, 2009, Plaintiff was on annual leave.

Except for a fraction of a day, this was "use-or-lose" annual leave which would have been

forfeited if not used by January 2, 2009, unless the Agency allowed it to be used from and after

January 5, 2009. Pye could have compelled Plaintiff to work these hours as long as she

grandfathered them for use later in 2009, but she did not elect to do this.

22. On January 5,2009, Plaintiff submitted a memorandum to Pye describing the

misrepresentations of fact and law made in the footnote referred to in paragraph 20, above, and

detailing the other considerations which demonstrated that the Director had breached her ethical

8

obligation in the *Classic Lath* case. The memorandum renewed Plaintiff's request to be taken off the case.

23. On or about January 7, 2009, Burson informed Plaintiff that Pye wanted a copy of what Plaintiff had written thus far of the request for authorization to seek an asset protective order. Plaintiff asked if this meant that he was being taken off the case. He replied that "She is thinking about it."

24. On or about January 15, 2009, Plaintiff completed the request for authorization to seek an asset protective order.

25. On or about January 16, 2009, Plaintiff asked Burson what was going on with the injunction matter. He replied that it was "in suspenso" and, when then asked if Plaintiff was still assigned to the case, answered no.

26. As noted, the *pro se* brief which Fragata submitted to the administrative law judge on or about December 18, 2008 did not address the timeliness issue. At that point, Pye, who is admitted to practice in Massachusetts, became ethically obligated by Rule 3.3 (a)(3) of the Massachusetts Rules of Professional Conduct (*and see*, ABA Model Rule 3.3 (a) (2)) to inform the judge of the legal authorities, referred to in paragraph 20, above, previously brought to her attention by Plaintiff which were directly contrary to her contention that the charge was not time barred. This, however, she failed to do.

27. (a) The decision of the administrative law judge issued on February 12, 2009. He found against Classic Lath and Fragata, whom he found to be personally liable as alleged in the complaint, on all issues, including that of timeliness. With respect to the issue of timeliness, the judge asserted that under the Act "an affirmative defense that is raised in an answer to the complaint is subsequently waived if the issue is not argued to the judge at the trial or in a party's

9

brief" and, as authority for this conclusion, cited *Wisconsin Bell, Inc.*, 346 NLRB 62 at fn.8 (2005). Neither *Wisconsin Bell*, nor any other case, says or implies that a timeliness defense alleged in an answer is abandoned ("waived") upon respondent's subsequent failure of to *articulate* (that is, to invoke or raise) the defense a second time at the hearing or in its brief. In *Wisconsin Bell*, the respondent in its answer had claimed that the charge should be deferred to the parties' contractual arbitration process for decision but failed to raise the issue at the hearing or in its brief. But whether a collective bargaining agreement confers primary jurisdiction on an arbitrator to decide any particular labor dispute turns on a consideration of the relevant contract language and such an inquiry can only be made after the proponent of deferral identifies what it considers to be the relevant portion(s) of the contract, which is an inherently subjective matter. The Board is in no position to guess what contractual provision the defendant is relying on, if for no other reason than that a provision which appears clearly to grant the arbitrator the requisite authority may be admitted by the parties, had the Board been able to inquire, to have become a dead letter long since. In contrast, the determination of whether a limitations period has passed is based on the observable facts and a reasonable person standard and therefore is made without reference to any private mental state of the plaintiff as to which his testimony is necessary. *DTR Industries*, 311 NLRB 833, 833 fn.1 (1993), which is a statute of limitations case cited to Pye in Plaintiff's aforesaid November 19, 2008 memorandum, provides the correct rule, namely, that an untimeliness defense is only waived when it is raised for the first time in the brief to the administrative law judge. That is, if a defense of untimeliness has been raised in the answer and proven on the record, the respondent is entitled to a dismissal of the complaint even if it failed to remind the judge of the issue at trial or in its brief.

(b) The judge then asserted that even if the timeliness issue was properly before him, the charge was timely. He based this conclusion on: 1) language in a Board case which says that, "The limitations period...begins to run only when a party has clear and unequivocal notice of a violation of the Act"; and, 2) his personal conclusion that the only unambiguous indication which the Carpenters had that Classic Lath had repudiated the collective bargaining relationship was when Fragata expressly told the Union that "he was no longer going to work with the Union," an event which took place within the limitations period. However, in *Vallow Floor Coverings*, 335 NLRB 20 (2001), cited to Pye in Plaintiff's aforesaid January 5, 2009 memorandum, the Board found that a union would *have* clear and unequivocal notice of a repudiation of the collective bargaining agreement when it learned that an employer had a "dual operation, one entity in compliance with the collective-bargaining agreement and one entity not in compliance." At the hearing, Carpenter officials had testified that they had concluded on four separate occasions outside the limitations period that Classic Lath was operating under a different name and failing to pay the wage and fringe benefits of the collective bargaining agreement.

(c) In *Amalgamated Transit Union, Local Union No. 1433*, 335 NLRB 1263 (2001), cited to Pye in Plaintiff's aforesaid January 5, 2009 memorandum, the Board held that a reasonably engendered suspicion that the Act has been violated begins the running of the limitations period unless the charging party acts with reasonable diligence to determine if in fact the Act has not been violated. In that case, the charge was held to be untimely when the employee charging party had developed, outside the 10 (b) period, "a gut feeling" based on certain interactions he had had with various union officials that the union had unlawfully induced the employer to discharge him but had failed to investigate further the truth of his suspicions. Thus,

*Amalgamated Transit Union, Local Union No. 1433* stands for the proposition that even equivocal evidence of contract repudiation is sufficient to begin the running of the limitations period if it would arouse a suspicion of repudiation in a reasonable person.

28. Pye's ethical breach in not bringing *Wisconsin Bell*, *DTR Industries*, and *Amalgamated Transit Union, Local Union No. 1433* to the attention of the administrative law judge is not excused even if we assume that even without them he knew perfectly well that the charge was time-barred. Had those cases been brought to his attention, which also means to the attention of Fragata, he could not have risked deciding the timeliness issue contrary to law.

29. (a) On February 17, 2009, Pye gave Plaintiff a written warning allegedly for intentionally dragging his feet in writing the request for authorization to seek an asset protection order.

(b) At no time prior to the issuance of the aforesaid warning had Pye or her subordinates indicated to Firenze that he was considered to not be making sufficient progress in writing the request for authorization.

(c) At no time prior to the issuance of the aforesaid warning had Pye or her subordinates provided Plaintiff with an opportunity to defend himself against the charge of willfully retarding his progress on the request for authorization. Since the inception of the Act in 1935, there as been an unwavering legion of Board cases holding that the failure of an employer to provide an employee an opportunity to defend himself against an imputation of misconduct before imposing discipline for the alleged offense is evidence that asserted reason for the discipline is pretextual.

(d) Pye had even failed to inquire before issuing the warning whether Plaintiff had ever completed the request for authorization. (Plaintiff, who was in no doubt that he would be

retaliated against as soon as he had submitted his aforesaid memorandum of November 19, 2008, only gave Pye a copy of his completed request for authorization within minutes of receiving the warning.)

(e) The warning relied on two items of "evidence." In Plaintiff's November 24, 2008 request to be taken off the case, he stated that the only loss the Agency would suffer if the request were granted would be the time he had spent reading the transcript. Pye, in her eagerness to put Plaintiff in the wrong, wishfully construed this as an admission that by November 24, 2008 the only work which Plaintiff had done with respect to his *Classic Lath* assignment was to read the transcript. In fact, Firenze had not only begun the request for authorization but had done as much work on the injunction papers themselves as was possible at the time. This written work, it goes without saying, was not lost to the Agency because it could be utilized by whoever the assignment was transferred to. The second item of "evidence" was the fact—true this time—that Plaintiff had written his January 5, 2009 memorandum during his 'use-or-lose' annual vacation referred to in paragraph 21, above. The warning states that "it is evident that you did spend significant additional effort [that is, in addition to Plaintiff's November 19, 2008 memorandum] on this case [i.e., arguing that the charge was time-barred] during your vacation, effort which could have been directed at completing your assignment." In a word, Plaintiff was implicitly being faulted for not having worked on the request for authorization during his leave time. But the Agency cannot lawfully require its employees to work during periods of annual leave.

30. Under 5 U.S.C. §§7513 and Article 18 of the Agency's collective bargaining agreement with the NLRBU (hereafter, the NLRBU contract), discipline may only be imposed to "promote the efficiency of the service." This entails that discipline must be imposed as soon as

13

practicable after the offense is determined to have been committed. Plaintiff was removed from the case in mid-January 2009 but only given the warning a month later. This unwarranted delay is, of course, explained by the fact that Pye was not willing to impose the discipline unless and until she had prevailed on the timeliness issue before the administrative law judge. If she had lost on the timeliness issue, she would only be inviting further embarrassment or trouble for herself were she then to punish Plaintiff in connection with his efforts to convince her to withdraw the charge.

31. Under Article 4 of the NLRBU contract, Agency employees are entitled to "[r]eceive fair and equitable treatment in all aspects of personnel management..., and with a proper regard for their...constitutional rights." Whether any particular conduct constitutes wrongdoing by an employee, or anyone else, for that matter, must be judged as of the time of the conduct at issue occurred. Subsequent events are wholly irrelevant to the issue of whether an employee chose to betray his obligation to his employer. Thus, it was grotesquely inequitable for Pye to determine that she would give Plaintiff a warning in connection with the *Classic Lath* case if she prevailed on the timeliness issue before the administrative law judge but not otherwise.

32. The deadline for appealing the administrative law judge's decision in *Classic Lath* was March 12, 2009. Fragata did not take an appeal. Only on March 12, 2009 did Pye send a request for authorization to seek an asset protection order to the Board. In the request, she stated:

> ...The Region is not filing Exceptions, and does not believe that Respondent, who is pro se, will be filing Exceptions. In the event that Exceptions are not filed, the Board will issue a pro forma order adopting the ALJ's decision.

While this 16-page request for authorization discusses the substantive merits of the charge at great length, it says not one word about the timeliness issue. This is the game that Pye was

playing. If she had addressed the limitations issue in her request by merely adverting to the fact that such a defense had been raised but decided in the Agency's favor by the judge in his decision *and* Fragata, contrary to her calculation, did in fact appeal the timeliness issue to the Board at the last moment, the Board would have immediately perceived that Pye had been deficient in candor with it, given how hopelessly inadequate the judge's reasoning was to overcome the force of the cases cited by Plaintiff for the conclusion that the charge was time-barred. Better by far, then, to not address the timeliness issue at all in the request for authorization and address the matter as best one might in a supplement to the request in the unlikely event that Fragata filed a belated but timely appeal on the issue.

33. (a) It was a grotesque breach of the fair treatment requirement of the NLRBU contract for Pye to have disciplined the Plaintiff for not having timely prepared the request for authorization which she herself had no intention of filing until the timeliness issue was out of the case, which could have been no earlier than March 12, 2009.

(b) The failure of Pye to come up with a single case to support a conclusion that the charge was not time-barred proves that she was convinced to a moral certainty by Plaintiff's November 19, 2008 and January 5, 2009 memoranda that the charge in *Classic Lath* was time-barred. It is unethical for an attorney to prosecute a legal claim which he or she believes to be non-meritorious.

Pye did not give Plaintiff, who had not dragged his feet in the writing of the request to seek a protective order, a chance to prove this before she issued the discipline precisely because she knew that he would be able to, which, in turn, would have made the pretextual nature of her disciplining of Plaintiff even more transparent. The February 17, 2009 warning was to be a pre-emptive strike calculated to force Plaintiff to give up any intention he might have

to see to it that she was held accountable for her unethical prosecution of Fragata or to make known her grossly incompetent handling of the case. As such, the warning is part and parcel of her unethical conduct and cannot meet the fair treatment standard of the NLRBU contract.

34. (a) On June 10, 2009, Pye issued Plaintiff's written annual appraisal for the preceding year. In the so-called "critical element" quality of work, the appraisal rated Plaintiff "Minimally Successful," the rating just one step above "Unacceptable." Plaintiff had never been rated Minimally Successful in any of the four critical elements before. The appraisal based this Minimally Successful rating on Plaintiff's performance in the *Classic Lath* case already discussed and in the *Steelworkers*, *DLC Corp.*, and *Electrical Dynamics* cases.

(b) With respect to the *Steelworkers* case, the appraisal alleged the following deficiencies. Plaintiff's trial brief "lacked any citation to Board law." While this is true, in this contract-formation case which only involved hornbook principles, Plaintiff did cite to a Supreme Court case and to *Williston on Contracts*. As noted, there is no citation to Board law, or to any other legal authority of any kind whatsoever, in the discussion of the timeliness issue in the Agency's trial brief in the *Classic Lath* case. However, none of those involved in the drafting of this unsupported argument, which included the two trial attorneys, two supervisors, the Regional Attorney and Pye, were faulted for their failure to cite any legal authority.

The appraisal asserts that Plaintiff "resisted" revising his brief in *Steelworkers* as directed by Burson, thus forcing Burson to make the changes. This is a lie. Plaintiff finished his brief in *Steelworkers* before it was due. Either immediately before or immediately after the brief was written but before its due date, Plaintiff was assigned to write a decision in a complex and novel representation case, *Scituate Fire*. Pye has admitted in writing, in response to an inquiry from the Union, that, except for the incident under discussion, she knows of no other instance in

which an attorney in Region One was assigned the writing of a representation decision in the period between the close of the hearing and the due date for the brief in an unfair labor practice case in which he or she was the trial attorney. The reason for this is that the Agency places a very high priority on speedily processing representation cases and it is just asking for trouble to impose a trial brief assignment with a representation assignment at the same time. Only after Plaintiff was given the *Scituate Fire* assignment did Burson instruct Plaintiff to revise the trial brief. Plaintiff asked Burson if he wanted him to stop working on *Scituate Fire* until he had revised the brief or the other way round. Plaintiff was told to complete the *Scituate Fire* assignment first. Nothing more was said until Plaintiff finished the *Scituate Fire* assignment, at which time he was informed that Burson himself had already revised the brief.

In revising the trial brief, Burson had cited as dispositive of the only issue in the case a Board case, *Windward Teachers Association*, 346 NLRB 1148 (2006). In that case, the parties at the bargaining table had ultimately agreed to contract terms which had been reduced to writing. However, the union later refused to sign the written contract because one of its provisions, although clear and unambiguous on its face, was inconsistent with an oral agreement made during the contract negotiations but prior to the assent which the parties had ultimately given to the written terms. The Board ruled that the parties were bound by the written agreement and therefore the union was obliged to sign the contract. Although the Board in *Windward Teachers Association* never used the words "parol evidence," this case embodies a classic application of that rule. In contrast, in *Steelworkers*, nothing in the facts raised an issue of whether oral statements should be allowed to vary the meaning of agreed-to written language which was clear and unambiguous on its face. There the parties had agreed in 1997 to a written contract one of whose provisions stated that a retiree who reached age 50 in 1997 would be entitled to a

17

particular health benefit, otherwise not. This same language was continued without change in subsequent written contracts. The employer's testimony was that its private understanding of the language of this provision had always been a literal one, namely, that in each subsequent contract the provision continued to mean that the retiree had to have reached 50 by 1997 and no later. The union testified that its private understanding had always been that "1997" in its first appearance had been intended as a shorthand for "the first year of the contract," an interpretation which entailed that retirees who reached 50 by the first year of each successive contract qualified for the benefit. The parties" respective understanding of the provision in issue was never communicated to the other side until the incident arose which brought out this divergence of understanding. Plaintiff merely pointed out to Burson that *Steelworkers* was a meeting of the minds case, while *Windward Teachers Association* was a parol evidence case and hence not relevant to the real issue in *Steelworkers*, namely, was there any basis in the evidence for concluding that the employer should have been aware of the union's understanding of the contract language at issue or did the union's interpretation constitute no more than a unilateral mistake which was not sufficient to prevent a meeting of the minds. The appraisal characterized this observation by Plaintiff as wrongful "resistance" to the Region's authority.

(c) In *DLC Corp.*, 353 NLRB No. 130 (2009), a union sought to have an election it had lost set aside based on alleged improper conduct by the employer. Plaintiff was the hearing officer in the proceeding to determine the validity of the election.

The employer had offered to pay, and did pay, off-duty employees four hours' pay if they voted in the election, which was held at its premises. Current law, as first announced in *Sunrise Rehabilitation Hospital*, 320 NLRB 212 (1995), which reversed prior precedent, holds that an employer may not pay off-duty employees "something extra" or "a reward" for voting in a Board

election. In that case, the election was set aside because the employer had given off-duty employees two hours' pay for voting in the election. In his recommendation to the Board, Plaintiff had reasoned that the grant of four hours' pay did not violate the rule in *Sunrise Rehabilitation Hospital* because, in contrast to that case, the employer had had an unwaivering historic practice of paying 'show up' time, namely, a minimum payment of four hours' wages whenever an employee was called in to work. Plaintiff noted that it has never been doubted by Board or the courts that an employer may pay its on-duty employees for the time they spend voting in a Board election held on its premises. Since under the employer's 'show-up' rule employees called into work for a reason other than voting in a Board election would have received a minimum of four hours' pay, there was no "reward" or "something extra" in paying them this same amount for complying with the employer's request that they vote. Accordingly, Plaintiff reasoned that *Sunrise Rehabilitation Hospital* was not on point and the payments of four hours' wages was proper pursuant to the principle, undisputed by either the Board or the courts, that employees may be paid for the time they spend voting at the employer's premises.

Plaintiff had further reasoned that even if the instant case were not distinguishable from *Sunrise Rehabilitation Hospital*, the latter case was inconsistent with the Congressional policy behind § 8 (c), the 'free speech' provision, of the Act. In Congress' view, the run-up to a Board election should be the equivalent of the political election process in a democratic society. In essence, that process, in the context of the Act, has two components: 1) free-wheeling, open debate on the pro's and con's of unionization prior to the election; and, 2) a fair and workable get-out-the-vote process. Plaintiff reasoned that the effect of *Sunrise Rehabilitation Hospital* was to restrict employers to a get-out-the-vote mechanism which is only calculated to cost an employer votes. If an employer exhorts its off-duty employees to come in and vote but then

cannot pay them an amount of money which they will regard as fair compensation for the effort of doing so, they will surely come in to vote because they will be afraid to risk the employer's displeasure if they do not, but at the same time what they regard as this unjust denial of fair compensation may well be the deciding factor in their voting for the union once they are behind the curtains of the voting booth.

Plaintiff's recommendation was passed on by Board members Schaumber, a Republican, and Liebman, a Democrat, who at the time were the only members of the Board, whose full complement consists of five members. This self-described two-member "Board"—the Supreme Court subsequently in *New Process Steel, L.P. v. N.L.R.B.*, 560 U.S.---, 130 S.Ct. 2635, ----L. Ed 2d----(2010), concluded that they were only usurpers and not the Board —decided, contrary to the view of the Plaintiff, that *Sunrise Rehabilitation Hospital* applied to the facts of the case and voided the election. However, they failed to offer a single reason to support this conclusion. The appraisal faults the Plaintiff for concluding that *Sunrise Rehabilitation Hospital* was a distinguishable case for the sole reason that these usurpers had waived their magic wands and said that it wasn't distinguishable.

The appraisal also asserts that in making his recommendation Plaintiff's "principal vice" was to exceed his authority "by stretching to correct, as he saw it, existing law, rather than apply it." The basis for Pye's assertion that an Agency attorney engages in misconduct as a hearing officer in an election case if he criticizes a current Board rule is the line of cases exemplified by *Ford Motor Co.*, 230 NLRB 716, 718, fn.12 (1977),  and *Doral Building Service, Inc.*, 266 NLRB 1215, 1217 (1983), ("...administrative law judges are obligated to apply Board precedent, unless such precedent is later reversed by the Board itself or by the United States Supreme Court"). But these cases do not stand for the proposition that NLRB administrative law judges

may not criticize current Board rules or discuss their lack of consistency with each other or with the intent of Congress, but rather for the proposition that they cannot base their decisions on *circuit court* interpretations of the Act which are inconsistent with the Board's interpretation of the Act. They represent the Board's rejection of the view sometimes advanced that Board, instead of applying a single interpretation of the Act, should apply to each case before it the interpretation of the Act of the circuit court within whose territorial jurisdiction the dispute had arisen. In a word, these cases are conflict of laws cases and not rules imposing censorship on inferior NLRB triers. If they were the latter, they would violate the First Amendment. In this connection, note that implied in the very concept of "existing law" is an assumption of internal consistency. There can be no such thing as "existing law" where legal principles are inconsistent with one another. Where, as Plaintiff found to be the case in *DLC Corp.*, the legal principals at play are inconsistent with one another, even the most inferior of triers has no reasonable alternative to pointing out the inconsistencies to the superior tribunals.

Had Pye been interested in the integrity of the legal process, as she claims, rather than in finding any stick to beat the Plaintiff with, she would have noticed that member Schaumber in *DLC Corp.* referenced his personal footnote in *Durham School Services LP*, 353 NLRB No, 129 (2009), a companion case raising the same issue, in which he states that the Act permits an employer to make an off-duty employee "a reasonable reimbursement" for the time he spends in going to vote, and returning from voting, in a Board election.[1] In a word , member Schaumber in

---

[1] As will be discussed more fully in paragraph 37, below, member Schaumber did not vote in these two cases, and many others, according to his good faith understanding of the Act, as he was required to do by the rules of judicial ethics, because that was impossible given the incompatibility between his understanding of the Act and that of member Liebman. Instead, they engaged in a process of horsetrading where each of them voted for outcomes they believed to be contrary to law in cases that were less important to them for whatever reasons in exchange for outcomes they considered in accordance with law in cases which were more important to them for whatever reasons.

reality accepted the Plaintiff's recommendation[2] and Pye perverted the very meaning of the word "recommendation" when she faulted the Plaintiff for his discussion of the implications of §8 (c) with regard to the issue of the permissibility of the payments made to off-duty voters.

Lastly, the appraisal faulted the Plaintiff for making "the questionable, and unnecessary, judgment of characterizing the referral procedures utilized by the Union as "nakedly unlawful" because "[n]o unfair labor practice charge to this effect had been filed, and as hearing officer in a representation case, it was beyond [his] competence to make this finding."

In the first place, there was nothing questionable about the unlawfulness of the union's hiring referral system because it determined seniority ranking on the referral list by the length of time worked for employers who recognized the union rather than on the required union-neutral basis of length of time worked for all employers within the territorial jurisdiction of the union, whether or not they recognized the union. In the second place, Pye has to misstate Board law to justify her criticism. The Board's only rule is that a party trying to set aside an election cannot interpose as a grounds for doing so a discrimination in job tenure based upon union membership or lack thereof unless this discrimination is also the subject of an unfair labor practice proceeding. That is, it bars the *offensive* use of such alleged discriminations of job tenure for the purpose of having an election set aside unless the proponent has persuaded the General Counsel, who has exclusive authority in the matter, to issue an unfair labor practice complaint with respect to the alleged unlawful discrimination. There is no case which bars the *defensive* use of a claim of unlawful discrimination. And see, the Agency's "An Outline of Law and Procedure in Representation Cases" Sec. 3-920 and its citation to *Warwick Caterers*, 269 NLRB 482 (1984),

---

[2] Agency hearing officers in election cases do not make "decisions," only "recommendations."

wherein the Board permitted a union in an unlawful picketing-for-recognition case to raise as a defense the unfair labor practice claim that the plaintiff employer was the *alter ego* of an employer who was already obligated to recognize the union, a claim which the Agency had previous refused to authorize for an unfair labor practice complaint. The lawfulness of the hiring hall procedures in *DLC Corp.* was not relevant to the union's claim therein that the election should be set aside, but, rather, to the employer's defense. One of the grounds the union was urging for setting aside the election was the employer's claim during the election campaign that a union victory might, as a result of the union's hiring hall rules, result in its current employees, who were the only the eligible voters, suffering a relative loss of work opportunities to employees who had not previously worked for the employer. Plaintiff found that the employer's interpretation of the union's hiring hall rules, upon which it based this campaign pitch, was a rational one and therefore this pitch was fair politicking. Plaintiff added, in effect, that while the employer had failed to point out that the hiring hall rules were also clearly unlawful in basing referral seniority on time spent on union-represented jobs, it had asked the eligible voters to scrutinize the hiring hall rules and some of the voters might discern this truth on their own and ask themselves if this unlawfulness did not in itself portend adverse impacts on their job tenure. [3]

(d) The appraisal says that as the investigator in the *Electrical Dynamics* case the Plaintiff cheated the plaintiff union out of an adequate investigation of its charge against the employer by "failing to fully [investigate] the alleged 8(a)(1) statements [that is, unlawfully coercive statements by the employer which are directed against employee activity in support of a union]."

---

[3] The pretextual nature of Pye's accusation that Plaintiff had exceeded his authority in *DLC Corp.* is emphasized by the fact that nothing in the decision by Schaumber and Liebman in that case indicated that they thought Plaintiff had done any such thing. The Supreme Court's decision in *New Process Steel* only came down after Plaintiff's appraisal for 2009 had issued. Prior to this decision, Pye had had no doubt that a two-member Board was a valid one.

It is a lie that the Plaintiff failed to investigate all the allegations of the charge. The charge only alleged that a union "salt"[4] had been threatened physically by a supervisor and two rank-and-file employees. In the investigation of the charge, the salt withdrew his claim that the alleged supervisor had threatened him physically and the union had no evidence that the alleged threats of the rank-and-file employees were either instigated or condoned by the employer, without proof of either of which no agency relationship with the employer could be established.

Plaintiff fully investigated not only the allegations set forth on the face of the charge, but also the additional unlawful threat allegations which the salt brought up orally during the investigation, as well as the incidents of unlawful discriminatory treatment which he orally asserted he had suffered at the hands of the employer because of his support for the union. Such acts of discrimination, if proven, constitute violations of $\S8(a)(3)$ of the Act.

The salt had kept a daily diary of what he claimed had transpired at work. The diary included a very large number of alleged statements which, had they been uttered by a supervisor, would have constituted violations of $\S8(a)(1)$. The diary also adverted to a large number of things which had happened to him on the job which he claimed in the diary to have been in retaliation for his support of the union. If these alleged discriminations were attributable to the employer, they would have constituted violations of $\S8(a)(3)$ of the Act. Plaintiff told his supervisor, Burson, that none of these diary accusations, whether they sounded in $\S8(a)(1)$ or $\S8(a)(3)$, appeared to offer any likelihood of turning into meritorious unfair labor practice claims upon investigation. Either the alleged acts of unlawful discrimination were such unpromising

---

[4] A salt is an individual who goes to work for an ununionized employer at the behest of a union and thereafter openly engages in activities in support of that union. The aim of salting is ordinarily to either organize that employer's employees or, if that is not possible, as was the case of *Electrical Dynamics*, to provoke the employer into committing retaliatory acts unlawful under the Act, which consequently result in legal costs for the employer.

things as being sent to work on an outside job on a hot day in July or a cold one in February, or the alleged perpetrator was said to be a supervisor of the employer based on such baseless and irrational premises as that the senior employee on any jobsite crew, even in the case of a two-man crew, had to be a supervisor within the meaning of the Act. Plaintiff further explained that in his opinion the charge did not represent a dispute between the union and the employer, but between the salt and the union. The salt was not, and never had been, a member of the union. About a year earlier, the salt, a 24-year old electrician, had gone to the union asking to be admitted to membership, which he hoped would lead to employment under the terms of a union contract. At the time, there was a severe recession in the construction industry and any construction trades union official who admitted to membership and found a union job for an electrician who, like the salt, had no union background could expect to be voted out of office at the next election. The union told the salt that he would have to salt the employer before he could be admitted to membership. The salt had never told the employer's employees, whom he was urging to unionize, that he was not and never had been a union member and had never worked for a unionized employer, obviously because this would have both destroyed his credibility and made him a laughingstock in the employer's company. The union had made a real attempt to organize the employer's approximately 75 employees not long before the salt was hired but had gotten nowhere. At the time the charge was filed, the salt had been working for the employer for almost a year, obviously for the reason that the union had no intention of finding him a union job. Since he had never indicated to the employer's other employees that he was not a union member and had no apparent prospects of gaining union employment, he was regarded by them as merely a mean-spirited spoiler who refused to stop harassing the employer even though there was no chance the employer could be unionized. As a result, he was shunned by virtually all the

other employees and on occasion verbally harassed by some of the younger ones. The employer's counsel said that he had advised the employer from the beginning to handle the salt with kid gloves and to intervene to protect him from hostile behavior from the other employees. This, of course, is what any labor attorney in his right mind would have advised his client in the circumstances and there was no indication that the employer had done otherwise. Plaintiff told Burson that in his, Plaintiff's, estimation, the salt did not even believe the accusations contained in his diary himself. They were not intended for use as a basis for an unfair labor practice complaint, because had that been the case, the salt would have brought them up in the investigation; rather they were intended for the eyes of the union official who had yet to find him a union job, a written record of the martyrdom he had suffered in the service of what he hoped would be a grateful union. Plaintiff told Burson that he would investigate these many diary accusations if so directed, but he thought the advisable course would be to ignore them and just address in his write-up of the case the allegations raised by the charge and by the salt orally during the investigation.   Burson said to do it that way "for now," meaning Plaintiff would have to investigate further if Pye made such a determination after her consideration of the case at the so-called agenda, a meeting at which the decision is made whether to issue complaint on a charge.

Plaintiff then wrote and submitted his report as agreed. Shortly thereafter, Plaintiff suffered the severely broken arm referred to in paragraph 12, above. In consequence, he did not attend the agenda held in the case, at which Pye, for reasons unknown to Plaintiff, apparently asked for an investigation of the diary allegations. However, Plaintiff did not participate further in the case as it was transferred to another attorney because of Plaintiff's injury. The Region agreed that the charges allegations discussed in Firenze's report lacked merit.

After the Plaintiff was removed from the case, the employer fired the salt and the union filed a new charge alleging that it was an unlawful discharge for union activities. This charge was investigated by the attorney who had replaced the Plaintiff in the original charge. In December 2008, there was an incident on a jobsite in which the salt claimed that he had received a 227-volt shock due to certain wires having been negligently left "live." The only other eye-witness to the event, an employee of another contractor on the site, said that the salt had not been shocked, the live wire had only hit a metal grid and shorted out, but that the salt had been so frightened that he jumped off the ladder. This witness said that the salt then said that he felt a little dizzy but he was alright. Some days after this incident, the salt left a voicemail for a supervisor of the employer in which he faulted him in connection with his conduct in this incident, saying among other things:

> ...You want to talk about being a baby, Joe, you hang up on me like a little fucking child, dude...You don't liven up circuits [when?] you[ve?] fucking capped it off. If you can't fucking do that –fuck you. You walk away from me and leave me, after I just got fucking wacked— fuck you—alright? How do you know I don't drop and have a seizure? How do you know I don't get injured on my fucking ride to the hospital, dude? Fuck you, you're a piece of shit, dude. Is that the kind of shit they teach you at the fucking'...at the fucking foremen safety meetings...I thought you fucking treated me decent [this supervisor had intervened in the past on the salt's behalf when he claimed that he was being harassed by other employees because he was a union salt].

The employer said that it had fired the salt because it could not tolerate such disrespect to a supervisor. This voicemail did reference the salt's union activities and his belief that he had suffered unlawful discrimination on account of it. An employee does not lose the protection of the Act if he engages in some minor misconduct in the context of engaging in union activities.

The obvious issue here is whether the salt's verbal attack on the supervisor was so serious and unprovoked as to render the salt unfit for further employment by the employer. We need not

decide this issue for present purposes.[5] For that, we need only note the following. First. The Agency will not be able to show that Pye ever found in another case that an employee did not lose the protection of the Act when he engaged in misconduct as great or greater than that evidenced in this incident. Second. Pye lies in the appraisal when she refers to "the discriminatee's [that is, the salt's] subsequent unlawful termination." The point, of course, which Pye is trying to convince the reader of is that the Plaintiff's wickedness in failing to follow up on and fully investigate the indications in the salt's diary that unlawful threats might have been made by the employer other than those alleged on the face of the charge is put beyond peradventure by the fact that the employer subsequently committed the capital offense of the Act, namely, firing an employee because of his union activities. The trouble is Pye never addressed, let alone answered, the question of whether the salt had been unlawfully discharged. The salt did not want reinstatement and therefore the employer proposed "adjusting the charge," as the Agency calls it, by paying him full backpay and posting a notice to employees which does not admit any liability for having violated the Act. The union accepted this proposal and Pye agreed to it without every considering the facts of the case and whether they supported the conclusion that the salt had been unlawfully discharged. Pye did falsely record in the Agency's record system that she had made a determination that the discharge was unlawful. By doing that, the case remained timely with respect to the Agency's case-handling standards. Had she not done this, the case would have "over-aged." Pye's annual bonus depends to a great extent on her processing cases in a timely fashion.

---

[5] Nor need we decide whether the salt had launched this attack on his supervisor for the very purpose of getting himself fired because he simply could no longer stand the stress of being a pariah at work, yet he feared that if he quit the union would have an excuse to not find him union work.

35. Agency attorneys, on a rotation basis, perform a so-called "information officer" function through which members of the public, such as employees, unions, and employers, may contact the Agency by phone or in person for information about the purposes and procedures of the NLRB, including whether they have a potentially valid unfair labor practice claim. The Agency's manual of instructions on how to process unfair labor practice charges (hereafter, the ULP Manual) provides, in § 10012.3, that:

> If an individual presents a situation that is clearly not covered by the Act, the [information officer] should so indicate and discourage the filing of a charge. If an individual asserts, however, the right to file a charge, the Board agent should take a charge...

As the information officer on September 14, 2009, Plaintiff was told by an employee that he had been suspended unfairly by his employer. The employee freely admitted that the underlying incident had not involved any union activities on his part, other concerted activities with his fellow employees addressed to the terms and conditions of their employment, or opposition to union activities, which are the only employee activities (besides seeking the aid of the NLRB itself) protected by the Act. Although advised by the Plaintiff that his suspension did not constitute an unfair labor practice but only a matter grievable under the just cause for discipline provision of his collective bargaining agreement, the employee nevertheless elected to file an unfair labor practice charge against his employer. Agency paperwork informed the employer that Plaintiff would be the investigator of the charge. Thereafter, the charge was in fact reassigned to another Agency employee to investigate. Before he had notice of this reassignment, the employer's attorney contacted Plaintiff, who told him of the reassignment and advised that he need not concern himself unduly as the employee had frankly admitted that no activity protected by the Act was involved in the case but only a contractual just cause for

discipline issue. The charge, after investigation, was dismissed by Pye on exactly the grounds which Plaintiff had advised the employee it would be dismissed.

For telling the employer's attorney that the employee was not contending that any protected activity was involved in his case, Plaintiff was given a three-day suspension, on the grounds that this conduct, among other things, "interfered with the investigation of the case; violated I[nformation] O[fficer] confidentiality; revealed potentially damaging information to parties prior to full investigation; reached a premature determination that a claim was without merit; [and] gave the impression to parties that [Plaintiff] had the authority to make [unfair labor practice] claim determinations".

For the most part, the ULP Manual addresses casehandling issues as to which there may be reasonable differences of opinion and sets forth the way which the Agency has resolved, wisely or unwisely, the competing considerations which made the matter debatable in the first place. It seldom sets forth rules as to which reasonable persons could not disagree. It nowhere says, for instance, that Agency employees may not murder their supervisors or members of the public who come before them. It says absolutely nothing about the extent to which information officers may divulge what they were told by employees or others who contacted them in this capacity. However, no reasonable person could disagree, in spite of the ULP Manual's silence on the subject, that it would be a most grievous offense for an information officer to divulge to an employee's employer that the employee had made an information officer inquiry or the contents of that inquiry, if the employee ultimately decided not to file a charge, for this would expose him to the danger of employer retaliation for having engaged in the protected activity of seeking assistance from the NLRB for no legitimate purpose.

But it is obvious that the incident in connection with which Plaintiff was given a three-day suspension is not assimilable to the situation just supposed. (To cite but one difference, after an employee has filed a charge against his employer, the cat is out of the bag and the war is on for good and earnest.)  Reasonable persons might disagree as to the advisibility of relating a plaintiff's preliminary statement of what his case was about to the respondent.  However, it is clear that the Agency's choice, whether or not it is the right one, is that the search for truth is better served by promptly revealing the plaintiff's preliminary account to the respondent. §§10052.3 and10052.5 of the ULP Manual say that after the attorney who is assigned to investigate the charge has had his initial telephone contact with the plaintiff and gained a preliminary understanding of the case he is free to contact the respondent employer or union.  In this contact, the investigator "should broadly describe the allegations of the charge" and solicit sufficient details from the respondent to facilitate the investigator's formal examination of the plaintiff, at which time the plaintiff's testimony is reduced to affidavit form.  If anything, an information officer interview which results in the employee being told he clearly has no case is, as it was in the incident under discussion, more detailed than the ordinary preliminary telephone contact between the Agency investigator and the individual who filed a charge.  Thus, there can be no rational basis for asserting that the Plaintiff should not have given the employer's attorney a broad description of the allegations of the charge, namely, that the employer had violated the just cause for discipline provision of the collective bargaining agreement in connection with employee conduct not protected by the Act, because he happened to have had on an information officer's cap rather than an investigator's cap, when in both situations the amount of information at his disposal is the same.

The Agency's enumeration of "offences" committed by Plaintiff in this incident convicts it of acting directly contrary to Agency policy reflected in §§10052.3 and10052.5, which favors early exposure of the positions of the parties. When a respondent has been told the plaintiff's preliminary account of his claim, he is in a position to impeach the plaintiff if the latter, upon becoming more familiar with the elements required to establish a violation of the Act as a result of his interaction with the investigator, changes his story to reflect those elements. Only if the affidavit which the employee ultimately gives to the investigator is inconsistent with the story he had told the information officer would what the latter had told the respondent have provided evidence "damaging" to the employee's case. Honest people are usually capable of giving convincing explanations for apparent inconsistencies in their testimony; dishonest ones are not.

The Agency's claim that the Plaintiff's in effect announcing that the charge lacked merit would have led the employer's attorney to erroneously conclude that Plaintiff had the authority to decide the merits of a charge on his own is so ludicrous that it demonstrates the Agency's animus against Plaintiff for his role in the *Classic Lath* case. The employer's attorney has practiced before the NLRB for decades and knows that a rank-and-file Agency attorney has no such authority.

On January 11, 2011, a Region One information officer other than Plaintiff met with an *Au Bon Pain* employee who was a subject of Morocco and could not make himself understood in English. He was accompanied by a fellow employee who translated for him, although she was handicapped by the fact that she had some difficulty understanding Moroccan Arabic, which apparently deviates from standard Arabic. The complaining employee told the information officer that he and other employees had expressed their dissatisfaction with what they considered to be unfair wage disparities among some of the employees, conduct which is protected by the

Act. Shortly thereafter he was transferred from the employer's Tufts Medical Center café to its

café in Dedham, which resulted in a longer and more expensive commute. His belief was that

this had been done in retaliation for his having engaged in the protected activity. Nothing is

more foreseeable in these circumstantial discrimination cases than that the employer, as

happened in this case, will deny any causal nexus between the protected activity and the

employer treatment being complained of. In spite of this fact, the information officer then and

there called a human resources representative of the employer who had no knowledge of the Act,

the NLRB, or the matter being complained of, and asked her to transfer the complaining

employee to the employer's café at the Park Plaza Hotel, which was a location acceptable to him.

The terrified HR representative complied. When the complaining employee's charge was fully

investigated, Pye concluded that the transfer to Dedham was a routine temporary one unrelated

to the employee's protected activity and that his set of skills made him the logical choice for the

transfer. Pye cannot deny knowing the details of the information officer's conduct described

above because they are all set forth in the internal Regional document upon which she based her

decision. However, the information officer was not even spoken to concerning her conduct, let

alone disciplined in any way.

36. On February 24, 2010, Plaintiff was given a 7-day suspension for three alleged offenses:

(a) In *Teamsters Local 82*, 27 members of the union each filed an unfair labor practice

charge, not all at the same time, alleging that its CEO had been personally operating a secret and

unlawful exclusive hiring hall. As might be expected, the CEO was the only witness presented

by the union in its defense and he gave his testimony in affidavit form. When thereafter, in June

2009, Plaintiff was taking an affidavit from one of the CEO's accusers, this member made a

statement of fact which Plaintiff regarded as improbable and which directly contradicted a

statement in the CEO's affidavit which he regarded as probable. Plaintiff told the member the

CEO's version of the event in question and that he had sworn to it in his affidavit. By this

second observation Plaintiff was suggesting to the member that he might want to think twice

before putting his version in his sworn statement. Reducing credibility conflicts during the

investigative stage of a case is part of an Agency attorney's job.

The Agency raised no issue with the fact that the member was told the CEO's version in

an effort to maximize the likelihood that the member would tell the truth in his affidavit.

Plaintiff's alleged offense in this incident was that he had adverted to the fact that the CEO had

given his evidence in affidavit form. The Agency asserted that this conduct violated the

following portion of § 10054.4 of the ULP Manual:

> **10054.4 Subsequent Charged Party Contact and Interview** If
> consideration of the {plaintiff's] evidence and the preliminary information
> from the [respondent] suggests a prima facie case, the appropriate
> [respondent] representative should be contacted to provide additional
> and more complete evidence...
>
> ....
>
> When communicating with the appropriate charged party
> representative to obtain evidence, Board agents should relate the
> basic contentions that have been advanced with regard to all
> violations alleged...Since the identity of a witness should be
> protected, the Board agent should, whenever possible, avoid
> providing details that would likely disclose the identity of the
> witness.

Even if we ignore the fact that §10054.4 on its face is only addressed to the investigator's full-

dress contact with the respondent, not with the plaintiff,[6] and assume that the CEO of Teamsters

Local 82 comes within the intendment of "a witness" in that section, it is clear that the above-

quoted portion of the section is only concerned with protecting a witness' identity when there is

---

[6] The NLRBU collective bargaining agreement provides that an Agency employee may not be disciplined for
violating an Agency rule or policy which he "did not know or reasonably could not have known existed."

any possibility ("whenever possible") that it may be unknown to the party being interrogated by the investigator. Since it was only this CEO's personal conduct which the plaintiffs were complaining about, it is inconceivable that they would not have been certain that he would be a witness in the case. Furthermore, it is equally obvious that § 10054.4 is only concerned with the protection of witnesses who are vulnerable to retaliation by the union or the employer involved in the case, who are the only entities which can commit unlawful retaliation under the Act, and the CEO was not vulnerable to retaliation at the hands of either.

The Agency further asserted that Plaintiff's conduct was inconsistent with the boilerplate on its affidavit form which says "I have been given assurances by an agent of the National Labor Relations Board that this Confidential Witness Affidavit will be considered a confidential law enforcement record by the Board and will not be disclosed unless it become necessary to produce the Confidential Witness Affidavit in connection with a formal proceeding." This language is the current formulation of the Agency's response to the Freedom of Information Act. From its inception, the Agency had always refused to provide copies of its investigatory affidavits to anyone outside the Agency for fear that employers and unions would use them to discover the identity of the employees who opposed them and then pressure them to abandon their testimony. After the enactment of FOIA, language equivalent to the above was first added to the affidavit form in order that the Agency might make the bootstrapping argument that its affidavits were exempt from FOIA disclosure because the Agency had thus, in effect, promised the affiants in writing that their affidavits were exempt from FOIA. But from the inception of the Act until the present, employers and unions have always been informed of the essential assertions of these affidavits for the obvious reason that charges could not be properly investigated without doing so. These oral disclosures inevitably inform the unions and

35

employers who the witnesses against them are, but this is an unavoidable cost of due process. Thus, however this ambiguous language may mislead affiants, certain it is that no Agency employee understands it as anything other than a promise not to let third parties have access to the affidavit documents themselves; that is, they do not regard it as having any particular relevance to the question of the circumstances in which it may be revealed that the key representatives of the parties have given their testimony in affidavit form

Furthermore, it is a rule of the Agency admitting of no exceptions that a charge will be dismissed for lack of cooperation if the plaintiff refuses to give an affidavit in support of the charge and this fact is universally known by all individuals who have any familiarity with the Agency. Thus, respondents always know that the plaintiff has given an affidavit if they are asked to make a full dress presentation of their defense. There can be no conceivable harm to any legitimate purpose of the Agency if plaintiffs know that the respondent has presented its defense in affidavit form rather than in any other form.

The Agency justified the length of this suspension in part on the fact that Plaintiff had "previously been suspended for failure to keep information confidential," a reference to the information officer incident which had resulted in Plaintiff's first suspension. However, as noted, the information officer incident had occurred on September 14, 2009, while the *Teamsters 82* incident had occurred in June 2009. The Agency's rage against Plaintiff and consequent avidity to rid itself of him for his shining an unwelcome light on Pye's unethical behavior in the *Classic Lath* case obviously made it incapable of even getting a  simple time-line straight.

(b) On January 12, 2010, as Plaintiff was explaining the facts of a case under investigation, his supervisor answered the phone without excusing herself and, again without explanation, left her office. When she returned, Plaintiff tossed what the Agency described as "a

36

very thin file" on her desk and said, "Read it yourself." When asked what his "problem" was, Plaintiff explained that her behavior had been rude. The Agency found this to constitute "inappropriate and disrespectful conduct."

The NLRBU collective bargaining agreement defines a grievance as "any complaint by any employee concerning any matter relating to the employment of the employee." Plaintiff's conduct in this incident qualifies as the presentation of a grievance within this definition. Under the Federal Labor Relations Act, just as under the Act, employees engaged in protected conducted such as presenting a grievance do not lose the protection of the statute if they engage in minor misconduct in the process.

(c) Plaintiff was first interrogated by the Agency, acting through the aforementioned supervisor, concerning the *Teamsters 82* incident on January 22, 2010.

In the course of this investigation, the supervisor accused Plaintiff of three acts of wrongdoing. The first has just been discussed in subsection (a), above.

The second was that the Plaintiff had "inserted himself" into the affidavit which he had taken from the Local 82 CEO.[7] The facts are these. A businessman in Hartford had given plausible, seemingly non-controversial, and internally consistent oral evidence in the case which, if anything, was favorable to Local 82. However, the CEO, while never disputing the accuracy of this testimony, exhibited great reluctance, for a reason which he did not disclose, to admitting its truth in his affidavit. After much to-ing and fro-ing, he ultimately agreed to have his affidavit

---

[7] Needless to say, neither the ULP Manual nor any other Agency directive known to the Plaintiff cautions Agency employees against "inserting themselves," whatever that may mean, into the affidavits they take.

state that he did not dispute the account which the Plaintiff had given him of the businessman's testimony.

The third was that the CEO's affidavit had not been broken up into paragraphs.

Plaintiff's response to these accusations was the following. There was no rule that it could not be revealed that the representative of a party had given his evidence in an investigation in affidavit form. There was no rule that the investigator could not be referred to in an affidavit. When Plaintiff first came to Region One in 1978 he was instructed to single-space affidavits and not break them into paragraphs because this made affiants feel that there would be less opportunity for someone to subsequently alter their affidavit; he had followed these instructions without deviation ever since; and Pye and other management officials had read countless affidavits taken by Plaintiff and never before told him that this was contrary to Agency policy. These groundless accusations of wrongdoing were merely further retaliation for Plaintiff's conduct in the *Classic Lath* case. Plaintiff then angrily threw down on his desk the CEO's affidavit, which he had been holding at the time.

In the document imposing the suspension, the Agency characterized Plaintiff's conduct just described as "inappropriate and disrespectful." It characterized his throwing the 9-page, 1.4 ounce affidavit onto his desk as throwing it "at" his supervisor, while subsequently stating, somewhat inconsistently, that Plaintiff was "not charged with assaulting" the supervisor. It claimed that Plaintiff "spoke to [the supervisor] in a heated manner, yelling...twice "'You people are out to get me because I am taking my case to arbitration.'" Thus, it is clear even in the Agency's characterization of Plaintiff's conduct he was presenting a grievance and did not engage in misconduct which removed the protection of the FLRA.

37.  On February 24, 2010, the Agency, in addition to issuing the above-described 7-day suspension, also issued Plaintiff a separate written warning for allegedly having violated a provision of the ULP Manual concerned with the information officer function.  But Plaintiff was not acting as an information officer when he engaged in the conduct to which this warning refers. Furthermore, if there was any wrongdoing on his part on this occasion, it constituted not an infraction of some mere bureaucratic prescription, but a grave breach of his ethical obligation as an attorney.  (There is, of course, an explanation for the leniency of the Agency's strictures in this instance and it will duly appear below.)

The Act dates from 1935.  With the Taft-Hartley amendments of 1947, the full complement of the Board was changed from three members to five.  Prior to 2008, the Board had never issued decisions with less than a three-member Board.  By custom, the Board has always consisted of three members of the party which holds the White House and two from the minority party.  In 2008, there were only two Board members, the aforementioned Schaumber and Liebman.  As noted, the former was a Republican and the latter a Democrat.  Their views of the Act were quite divergent, to say the least, but their personal relations were cordial.  They apparently resented the inability or refusal of Congress to increase the number of Board members, failing to understand that since Congress has the undoubted right to repeal the Act altogether, it certainly has the lesser right to, in effect, temporarily suspend it by failing or refusing to appoint a quorum of Board members.  So, starting in 2008, they began issuing decisions in unfair labor practice cases and representation cases based on their claim that they constituted a quorum of the Board within the intendment of the Act.  Plaintiff cared not a feather for the intent of Congress because he was convinced that there could be no due process within the meaning of the Constitution where decisions issued from two judges who were institutionally

destined to be, and were in fact, of opposed views of the law. Inherently, such a panel of judges can only make meaningful progress in case processing, which is what Schaumber and Liebman believed that Congress was wrongfully preventing, if they forego deciding cases according to law, that is, according to their good faith view of what the law is, and engage in a form of horse trading in which the deal is this: 'I will decide this case, which does not mean that much to me, contrary to my view of the law but in accordance with your view of the law, if with respect to a case which does not mean that much to you but means something to me, you will similarly vote for a result which is contrary to your view of law, but in accordance with my view of the law.' Such an arrangement is completely contrary to the first principle of judicial ethics, namely, that cases must be judged according to law and nothing else. Both Schaumber and Liebman were so out of touch with their judicial obligation that they frankly admitted in personal footnotes in those decisions in which they had voted contrary to their view of the law that they had done so for "institutional reasons," that is, because they wanted the Board to keep generating decisions, whether or not they were legally correct.[8]

The lower courts disagreed as to whether a two-member panel of the Board had authority to issue decisions and the Supreme Court granted certiorari in the *New Process Steel* case. The lower courts had only based their conflicting decisions on their view of Congressional intent; that is, they never reached the constitutional due process issue.

---

[8] Deciding cases "for institutional reasons" in this sense has nothing to do with the doctrine of *stare decisis*. Under that doctrine, the trier announces that were the matter one of first impression he would not have fashioned the current rule, but nevertheless concludes that the current rule is not so ill-conceived that it is worth upsetting stabilized expectations by replacing it with a different rule. In a decision based on *stare decisis*, there has been a decision on the merits: the trier affirms that the current rule should be continued without change in spite of its perceived shortcomings. In contrast, in their decisions based on "institutional considerations," Schaumber and Liebman indicated the different result they would have voted for had there been a Board panel large enough to render decisions without unanimity among its members.

The U.S. Chamber of Commerce filed an amicus brief in *New Process Steel*. Their attorney of record in that case was Marshall Babson, who had been a member of the Board between 1985 and 1988. Pye had been his chief legal assistant during his tenure as a Board member before she became the Regional Director of Region One in 1989. Correctly or incorrectly, the general view in Region One was that Pye had maintained a personal relationship with Babson since becoming the Regional Director and gave him legal advice with respect to cases which he handled in his private practice.

Plaintiff's view was that it would be extremely difficult for anyone using Boolean methods of legal research to discover the personal footnotes of Schaumber and Liebman in which they in effect admitted that they were horse trading case outcomes. On January 19, 2010, while *New Process Steel* was still pending before the Supreme Court, Petitioner e-mailed Babson:

> Take a look at *DLC Corp.*, 353 NLRB #130 (2009). The hearing officer (myself) recommended that the Union's objections be overruled. The two-member Board reversed, but not on the merits. In fact, the Republican member stated, in effect, that he agreed, at least in principle, with the hearing officer, but reversed for "institutional reasons"...Deciding a case on something other than the merits, whether you call it "institutional reasons," or anything else, is a denial of due process, indeed, of reason itself...

The warning claimed that Plaintiff's e-mail violated ULP Manual §10012.1. But this section says that information officers in their contacts with inquiring members of the public:

> ...should not offer an opinion as to whether any specific conduct violates the Act. Rather, the Board agent should describe the types of conduct which, depending on all of the surrounding circumstances, may constitute a violation of the Act.

41

Plaintiff's e-mail in no way concerned the giving of premature assurances to members of the public that an unfair labor practice has or has not been committed, which is the subject matter of this aspect of §10012.1.

To be sure, §10012.1 also says that information officers "may not give legal advice," but Plaintiff was operating in an entirely different context. It is unethical for judges to decide cases on grounds other than according to law. Federal employees are required by Executive Order to report such wrongdoing to "appropriate authority." Babson was an officer of the court, and hence himself an appropriate authority, and in a position to bring the matter to the attention of another appropriate authority, the Supreme Court. Plaintiff was not an attorney of record in the *New Process Steel* case. Agency attorneys make up something like one-third of the bar which has expertise in the Act. If they can be prevented from discussing a legal point raised by decisions already spread in the public record for no other reason than that they are employed by the Agency, a grave First Amendment issue would be raised. This is especially so in the instant case, since the essence of the Plaintiff's contention was that the Schaumber-Liebman panel did not constitute the Board, but were only lawless usurpers, a conclusion with which the Supreme Court agreed (based on its reading of the intent of Congress) in its decision in *New Process Steel*. Moreover, under ABA canon of ethics Rule 1.13, even a lawyer of record for an organization does not breach its duty of confidentiality when it takes reasonable steps to protect the organization from substantial harm as a result of the wrongful acts of its officers.

In response to a NLRBU Local 1 information request, Pye admitted in writing that she learned of Petitioner's January 19, 2010 e-mail from Babson himself no later than January 20, 2010 and that Babson had not complained of Plaintiff's conduct. The first contact which the Agency had with Plaintiff concerning this matter was the issuance of the warning itself on

42

February 24, 2010. Since, as noted in paragraph 30, above, the Agency is required by its own principles to impose discipline as soon as possible to maximize the remedial effect, the delay in issuing the warning requires explanation.

The NLRBU Local 1 information request had asked Pye if there had been "any discussion of the issue(s) before the Supreme Court in *New Process Steel*" between her and Babson in whatever contacts they may have had concerning Plaintiff's e-mail. Pye replied, "Whether or not Attorney Babson and I discussed *New Process Steel* is not relevant." Local 1 replied that the question was relevant because if she had discussed the case with Babson this would have been giving legal advice and yet she had not been disciplined. At that point, Pye denied having discussed the case with Babson.

The gravamen of the offenses alleged in both the Babson and *Teamsters 82* incidents is one of breach of confidentiality. The two incidents which were combined with the *Teamster 82* incident to warrant the 7-day suspension involved allegations of rudeness, which is quite unrelated conduct. Why wasn't the Babson incident combined with the misconduct alleged to support the 7-day suspension and the Plaintiff instead given a suspension of greater duration? The obvious answer is that the Agency did not want to link "giving legal advice" with the consequence of suspension in case it was ultimately forced to admit the truth of the matter, namely, that Pye had given legal advice to Babson no less than Plaintiff had.

38. §102.69(e) of the Board's Rules and Regulations provides "that, upon the close of [a hearing on objections to an election], the hearing officer shall, if directed by the Regional Director, prepare and cause to be served on the parties a report resolving questions of credibility and containing findings of fact and recommendations as to the disposition of the issues."

On July 14, 2010, the Acting Regional Director issued an order directing Petitioner to sit as hearing officer on the employer's objections to the election in the *Avery Manor Nursing Home* case. In due course, Plaintiff drafted his Report on Objections recommending that the employer's objections be overruled and the union certified as the representative of the employer's employees. On August 20, 2010, without any notice to the parties, Pye ordered Plaintiff to delete whole sections of his argument, not because she deemed them invalid but because their very validity either exposed some inconsistencies in Board decisions or, in one instance, was inconsistent with the position she personally had taken, unbeknownst to Petitioner, with a delegation of the Massachusetts AFL-CIO that there was no element of unfairness in holding Board elections on the employer's premises. Petitioner responded that Pye should consider whether it wasn't unethical for her to make this *ex parte* and unsolicited attempt to induce him to alter a decision which under the Board's Rules and Regulations was to be solely his own and refused to alter his Report on Objections.

It is elementary due process that the parties to a legal proceeding know who their judge is, that is, the identity of the person who in fact controls the decision, because without this knowledge they cannot protect themselves from a judge who is biased against them. Pye's approach to Petitioner cannot be confused with a judicial "consultation." There are two requirements for a licit judicial consultation: 1) only the judge before whom the case is pending may initiate the consultation; and, 2) he must "not abrogate the responsibility personally to decide it," Commentary to Rule 3:09, Sec. 3B(7)(c), Massachusetts Code of Judicial Conduct.

On October 18, 2010, Plaintiff was given a 10-day suspension for refusing to accede to Pye's unethical demands. The Agency's document announcing the suspension is couched in terms of Plaintiff's "insolence" and "disrespect" toward Pye but it is plain enough from the face

of the document that the true gravamen of the offense was his refusal to alter his Report on

Objections:

> ...[The Agency has] considered all of the documents *supporting* the
> suspension, *including...your hearing officer's decision* [emphasis added].
> ...You disrespected {Pye's] viewpoint and her legal analysis; indeed,
> you dismissed it outright... at the very time she was attempting to instruct you
> in how to improve your analysis and provide you with valuable feedback
> on your written work.. Your failure to accord the Regional Director, the
> ultimate authority on written work in Region 1, with the basic respect
> that all supervisors and managers in this Agency are owed is deeply
> troubling...[The Agency has] no choice but to find that you were both
> insolent and disrespectful.

39. The NLRBU timely filed for arbitration with respect to the three suspensions and two

warnings administered to Plaintiff described above, as well as to the Agency's annual

performance appraisal of Plaintiff dated June 10, 2009. The Board has always held that it is

protected activity under the Act for employees and unions to publicize their labor disputes with

private employers. However, when Plaintiff informed the Agency of his wish to publicize the

fact that the NLRBU had filed for arbitration to challenge these acts of discipline and the 2009

performance appraisal, the Agency responded by an e-mail dated January 7, 2011:

> In response to your inquiry of January 5, 2011, the Agency is
> concerned that *any* communications regarding your suspensions or other
> disciplinary action with parties to our cases or to members of the public
> contacting the NLRB about NLRB matters would undermine the integrity
> of the Agency and its ability to fairly effectuate the Act. Such
> communications to the public also put parties and witnesses in a position
> where they have to choose between you and the Agency or risk alienating
> you or the Agency by not taking a position. You may not communicate *in*
> *any way* about any discipline by the Agency with parties, lawyers, other
> representatives, and witnesses to your cases or other members of the
> public who contact the NLRB about NLRB matters...

This order constitutes a prior restraint of speech and cannot pass First Amendment

scrutiny because it is based on the untenable premise that any reference by an

45

Agency employee to a labor dispute between the NLRBU and the Agency must necessarily amount to an act of extortion. *See,* *International Association of Firefighters Local 3233 v. Frenchtown Charter Township*, 246 F. Supp. 2d 734 (2003). Moreover, only if the public is made aware of Agency labor disputes can it protect itself from suffering adverse consequences as a result of those disputes. One way, for example, for an agency to retaliate against an employee with whom it is involved in a labor dispute is to falsely find fault with his work, but this entails rejecting the casehandling result which that employee has correctly recommended.

40. Article II of the NLRBU constitution provides that:

It shall be the purpose of the Union...to engage in all activities appropriate to an organization of employees of the United States Government. This shall include...the representation of said employees ...and resolving their grievances.

Article XI, §4 of said constitution provides that:

The responsibility for representing...bargaining unit employees in all grievance proceedings...after the final Agency answer shall be vested in the [NLRBU] Executive Committee, following consultation with the grievant, the Local Union and the respective District Vice President involved.

On or about December 17, 2011, the NLRBU, without any prior consultation with either the Petitioner as grievant or NLRBU Local One, of which the Plaintiff was and is the President, made a first written offer of settlement to the Agency which was open for acceptance by its terms until December 22, 2011. The Agency accepted this offer. The settlement only rescinded the *Avery Manor* suspension and the *Classic Lath* warning. The other discipline and the evaluation remained intact. Since the very essence of the

46

Union's case was that all the discipline had been pretextually imposed to ultimately bring about the discharge of the Plaintiff, the settlement did no more than slow down that process.

The failure of the Union to comply with Article XI, §4 was aggravated by the fact that: 1) every member of the Executive Committee ignored Plaintiff's written demand that the Union withdraw its offer and consult with him first; and, 2) the Union refused to provide any explanation of the reasons why it had decided to make the settlement offer which did. That the Union is unable to offer any reasonable explanation for its conduct is further suggested by its earlier statement in its Winter 2011-2012 newsletter that "Local 1 (Boston) is moving toward a much anticipated arbitration scheduled for early 2012, regarding a chain of disciplines and related matters issued to a single employee."

The Union further breached its duty of fair representation because it accepted the advice of its attorney, Ronald Scott, to settle the case at a time when Scott was unfamiliar with both the facts of the case and the applicable law. To cite but one illustration of this point, during the course of Plaintiff's conversation with Scott on December 17, 2011 in which the latter had announced the Union's settlement offer, Plaintiff remarked that his case was an interconnected web of First Amendment issues. Scott angrily replied that this was an arbitration case and arbitrations had nothing to do with constitutional issues. When Plaintiff pointed out that the 'just cause for discipline" provision of the collective bargaining agreement required "fair and equitable treatment [of employees]...with

a proper regard for their...constitutional rights," Scott replied that he wasn't very familiar with the terms of the collective bargaining agreement.

## Count 1

41. By the three suspensions, two warnings, and poor 2009 annual valuation given to Plaintiff, as described above, the Agency has violated Article 4 of the NLRBU collective bargaining agreement.

## Count 2

42. By forbidding Plaintiff and all other Agency employees to publicize labor disputes between the Agency and the NLRBU, as described above, the Agency is imposing a prior restraint of speech in violation of the First Amendment.

## Count 3

43. By settling Plaintiff's grievances as described above, contrary to the requirements of its constitution, in the absence of due diligence, and without any rational justification, the NLRBU has violated both its statutory and contractual duty of fair representation.

## Relief Sought

44. Plaintiff requests that the Agency be ordered: 1) to rescind the discipline described above and make Plaintiff whole, including interest, for all lost wages, benefits, and pension rights; 2) to refrain from further retaliation against Plaintiff for performing his proper duties as an Agency employee; and, 3) to appropriately revise his 2009 annual evaluation. Plaintiff further requests the Court to take such

action as it deems appropriate with respect to the violations of ethical duty committed by Pye and other officials of the Agency as described above.

45.  Plaintiff requests that the NLRBU be ordered: 1) to make Plaintiff whole, including interest, for all lost wages, benefits, and pension rights which he suffered, or may suffer, as a result of the discipline described above; and, 2) to pay Plaintiff's legal expenses in connection with this litigation which he would not have incurred had the Union not breached its duty of fair representation.

46.  Plaintiff further requests all other relief with respect to both the Agency and the NLRBU as is just and proper.

Respectfully submitted,

Don Firenze, *pro se*
BBO# 166940

P.O. Box 8354
Boston, MA02114
Telephone: 617-565-6774
E-mail: don.firenze@nlrb.gov

May 16, 2012