# United States District Court
# District of Massachusetts

DON FIRENZE,
      Plaintiff,

    v.                             CIVIL ACTION NO. 12-10880-PBS

NATIONAL LABOR RELATIONS BOARD,
NATIONAL LABOR RELATIONS
      BOARD UNION,
          Defendants.

*REPORT AND
RECOMMENDATION ON
MOTION FOR SUMMARY JUDGMENT
AGAINST NATIONAL LABOR RELATIONS
BOARD WITH RESPECT TO
COUNT II OF THE COMPLAINT (#47)
AND DEFENDANT NLRB'S CROSS-
MOTION FOR SUMMARY JUDGMENT
AS TO THE REMAINING COUNT II (#57)*

COLLINGS, U.S.M.J.

## I. Introduction

On May 16, 2012, plaintiff Don Firenze ("Firenze") filed a three-count complaint (#1) against the defendants National Labor Relations Board ("NLRB") and the National Labor Relations Board Union ("NLRBU"). Firenze is an attorney with the NLRB's Boston Regional Office, known as Region One. (Local Rule 56.1 Statement of Material Facts Not in Dispute #53[1] at 2) He is represented in collective bargaining and related employment matters by the NLRBU. (#53 at 2)

---

[1]

Local Rule 56.1 provides as follows:

> Motions for summary judgment shall include a concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried, with page references to affidavits, depositions and other documentation. Failure to include such a statement constitutes grounds for denial of the motion. Opposition to motions for summary judgment must be filed, unless the court orders otherwise, within 21 days after the motion is served. A party opposing the motion shall include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation. Copies of all referenced documentation shall be filed as exhibits to the motion or opposition. Material facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties. Unless the court orders otherwise, the moving party may file a reply within 14 days after the response is served.

While the parties have filed statements of undisputed material facts in support of their respective motions, neither has filed "a concise statement of material facts of record as to which it is contended that there exists a genuine issue to be tried." In these circumstances, under the local rule, the parties' respective statements of undisputed material facts are deemed admitted. Such treatment accords with the provision of Rule 56(e)(2), Fed. R. Civ. P.

The NLRB and NLRBU each filed motions to dismiss the complaint. (##8, 15)   On January 10, 2013, the undersigned issued a Report and Recommendation on the dispositive motions, recommending that NLRBU's motion to dismiss Count III, the only count against the NLRBU, be allowed. (#30)   It was further recommended that the NLRB's motion to dismiss be allowed with respect to Counts I and III, but denied as to Count II. (#30)   On February 19, 2013, Chief Judge Saris adopted the Report and Recommendation in relevant part and dismissed Counts I and III. (#37)   Thus, at this juncture, the sole remaining claim is that alleged in Count II, to wit, that the NLRB violated Firenze's First Amendment right to free speech by imposing a prior restraint of speech on its employees when it forbade them from publicizing labor disputes between the NLRB and the NLRBU. (#1 ¶ 42)

On June 11, 2013, Firenze filed a motion for summary judgment as to the remaining Count II of the complaint. (#47)   In conjunction with his motion, Firenze filed a motion for leave to exceed page limits (#48), which was granted. (#49)   The plaintiff then filed a memorandum of law in support of the summary judgment motion (#50) and a statement of material undisputed facts. (#53)   Attached as exhibits to Firenze's statement of undisputed material facts are an affidavit of Firenze (#53-1) and a copy of certain e-mail exchanges.

(#53-2)

On August 13, 2013, the NLRB filed a cross-motion for summary judgment (#57) together with a memorandum in support of its cross-motion and in opposition to Firenze's motion (#58), a copy of certain e-mail exchanges (#60), the declaration of NLRB Special Counsel Elizabeth H. Bach (#59), and a statement of material undisputed facts.[2] (#61)  Eight days later on August 21, 2013, the plaintiff filed a "reply brief," in reality an opposition, challenging the NLRB's cross-motion for summary judgment. (#63)  Following an extension of time, on September 13, 2013, the NLRB filed a reply memorandum to Firenze's opposition to the NLRB's cross-motion for summary judgment as to the remaining Count II. (#68)

At this juncture, the record is complete; the motion and cross-motion for summary judgment stand ready for decision.

## II. Factual Background

A series of labor disputes arose during Firenze's course of employment at the NLRB's Boston Regional Office based on conduct occurring between July 2008 and December 2010. (#53-1 at 1; #59 ¶ 5;  61 ¶ 1)  As a result, six

---

[2]

Although Dockets ## 59 and 60 were filed separately from Docket #61, they are referenced as exhibits to Docket #61.

grievances were filed on the plaintiff's behalf under the collective bargaining agreement's grievance and arbitration provisions. (#61 ¶ 1)  The gravamen of Firenze's grievances, discussed *infra*, was his contention that the disciplinary actions against him were unwarranted and were taken by his supervisor, Regional Director Rosemary Pye ("Pye" or "Regional Director Pye"), because the plaintiff had accused Pye of unethical conduct and implied that his understanding of the law was superior to hers. (#63)

The first grievance was in response to a February 17, 2009 written reprimand Firenze received in connection with the *Classic Lath* case to which he had been assigned. (#59, Ex. A)  The plaintiff had requested to be removed from the case because he considered it barred by the six-month statute of limitations. (#59, Ex. A)  When Firenze was not removed from the case, while on annual leave he drafted a memorandum in which he concluded that the complaint in *Classic Lath* was time-barred and accused Regional Director Pye of breaching her ethical obligation to disclose that fact to the adjudicating Board. (#59, Ex. A)  The plaintiff eventually drafted the assigned documents, but was cited for dragging his feet in doing so. (#59, Ex. A)

The second grievance was in response to an annual performance appraisal

issued on June 10, 2009, for Firenze's work in the preceding year. (#59, Ex. B)

Under the "critical element" quality of work category, the plaintiff received a

"Minimally Successful" rating for his performance in the *Classic Lath* case. (#59,

Ex. B)

The third grievance was in response to a three-day suspension issued in

November 2009. (#59, Ex. C)   The grounds for suspension included

interference with the investigation of a case and violation of the Information

Officer confidentiality requirement, which the NLRB alleged occurred when

Firenze told a respondent's attorney that the complainant had admitted that no

protected activity under the Act had occurred.  The plaintiff's communication

was said to have: "revealed potentially damaging information to parties prior

to a full investigation; reached a premature determination that a claim was

without merit; gave the impression to parties that [he] had the authority to

make determinations; and countermanded specific instructions from [his]

supervisory chain." (#59, Ex. C)

The fourth grievance was in response to a written warning Firenze

received on February 24, 2010, for an alleged violation of a provision of the

Unfair Labor Practices (ULP) Manual pertaining to the Information Officer

function. (#59, Ex. D)  As grounds for the warning, the NLRB asserted that on January 19, 2010, Firenze sent an email to an attorney involved in Supreme Court litigation against the NLRB.  (#59, Ex. D)  In that email, the plaintiff wrote that the NLRB engaged in a "denial of due process" when it decided a case for "institutional reasons" rather than on the merits. (#59, Ex. D)

The fifth grievance was in response to a seven-day suspension proposed by Pye on February 24, 2010, for failure to follow confidentiality requirements regarding investigative affidavits, and for disrespectful and inappropriate conduct towards a supervisor, including throwing a file in the direction of his supervisor because Firenze had found her behavior to be rude and dismissive. (#59, Ex. E)

The sixth grievance was in response to an October 10, 2010 ten-day suspension for disrespectful conduct toward Regional Director Pye. (#59, Ex. F)  Firenze's alleged disrespectful behavior included, *inter alia*, telling Pye that she was "not analytical," that he would not be a "good little bureaucrat," and implying that he was smarter than her. (#59, Ex. F)

Pursuant to the collective bargaining agreement's grievance and arbitration provisions, the NLRBU referred Firenze's six grievances for

arbitration. (#53 at 2)  In April 2010, before arbitration was set to commence, the plaintiff sent an email to Regional Director Pye asking whether he was permitted to tell people who deal with the NLRB that he had been suspended. (#53-2)  Pye replied that "[i]t would help us answer your question if you tell us why you need to tell people you have been suspended." (#53-2)  Firenze wrote back:   "I could not even begin to think of all the particular reasons I might want to tell people that I have been suspended but the general reason is that I prefer to be able to speak the truth." (#53-2)  In response, on June 21, 2010, Pye sent an email stating that Firenze "may not communicate in any way about any discipline by the Agency with parties, lawyers, other representatives, and witnesses to your cases or other members of the public who contact the NLRB about NLRB matters" as doing so "would undermine the integrity of the Agency and its ability to fairly effectuate the [National Labor Relations] Act." (#53-2)

Firenze responded to Pye's directive with a series of hypotheticals to clarify the class of people with whom he was prohibited from discussing his grievances with the NLRB, such as whether participants to closed cases or certain newspapers who have come before the NLRB were off-limits. (#53-2) Pye replied that the plaintiff's questions were answered in her original directive

8

which provided him "sufficient guidance to exercise [his] professional judgment appropriately" and that she did "not want to speculate about hypothetical situations." (#53-2)  Regional Director Pye did invite Firenze to contact her if a specific situation arose in which he needed further guidance. (#53-2)

On December 27, 2010, the NLRB and the NLRBU agreed to settle the six grievances referred for arbitration by, *inter alia*, the NLRB expunging all materials relating to the written reprimand of February 17, 2009, the February 24, 2010 written warning, and the October 18, 2010 ten-day suspension from Firenze's record; the NLRB agreeing not to rely on those three incidents as a basis for future personal or disciplinary action; and Firenze being paid a sum representing ten days pay plus interest. (#59, Ex. G)

On January 5, 2011, Firenze wrote to the NLRB to express his desire to publicize the fact that the NLRBU had filed for arbitration to challenge the discipline imposed on him in 2009 and 2010. (#1 ¶ 39; #44 ¶ 39)  Two days later on January 7, 2011, the NLRB sent an email in response to Firenze that largely echoed Pye's June 2010 directive, stating in part:

> ...the Agency [the NLRB] is concerned that *any* communications regarding your suspensions or other disciplinary action with parties to our cases or to members of the public contacting the NLRB about

NLRB matters would undermine the integrity of the Agency and its ability to effectuate the [National Labor Relations] Act ... You may not communicate *in any way* about any discipline by the Agency with parties, lawyers, other representatives, and witnesses to your cases or other members of the public who contact the NLRB about NLRB matters....

(#1 ¶ 39; #44 ¶ 39) (emphasis in original).

### III. Summary Judgment Standard

The purpose of summary judgment is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Rojas-Ithier v. Sociedad Espanola de Auxilio Mutuo y Beneficiencia de Puerto Rico*, 394 F.3d 40, 42 (1 Cir., 2005) (internal quotations marks and citation omitted). However, in a case like the instant one in which the facts are essentially undisputed, the Court can resolve questions of law on the summary judgment record.

## IV. The Summary Judgment Motions

### A.  The Plaintiff's Motion

In his motion for summary judgment, Firenze argues that his intended speech touches upon matters of public concern, and that his interest in making the speech outweighs the NLRB's interest in more efficiently servicing the public through suppressing it.[3] (#50)  The NLRB takes the position that the suspensions Firenze sought to discuss with "parties doing business with the NLRB do not qualify as a matter of public concern" (#57) and, if the Court finds otherwise, that nevertheless the NLRB's interest in serving the public through the restriction outweighs Firenze's interest in making the speech.

It is firmly established that the Government may not impair its employees' right to speak as citizens on matters of public concern.  *U.S. v. Nat'l Treasury Employees Union*, 513 U.S. 454, 465 (1995) (citing *Pickering v. Bd. Of Educ.*, 391 U.S. 563, 568 (1968)); *see Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006) ("The Court has acknowledged the importance of promoting the public's interest in

---

[3]

    In his reply brief, Firenze states that "[t]he essence of Plaintiff's argument in his motion for summary judgment as to Count II is that as a matter of law *any* grievance brought by a federal union under its collective bargaining agreement presents a matter of public concern, regardless of the substantive nature of the underlying dispute." (#63 at 3) (emphasis in original; footnote omitted).  This overbroad contention is unavailing.  *See*, e.g., *Tang v. State of Rhode Island*, 163 F.3d 7, 11-12 (1 Cir., 1998).

receiving the well-informed views of government employees engaging in civic discussion."). When the Government acts as an employer, it may regulate the speech of its employees to a greater extent than it may regulate the speech of non-employees when acting in its role as sovereign. *Waters v. Churchill*, 511 U.S. 661, 671 (1994) (plurality opinion); *see Garcetti*, 547 U.S. at 418-19 ("Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services.   Public employees, moreover, often occupy trusted positions in society. When they speak out, they can express views that contravene governmental policies or impair the proper performance of governmental functions.") (internal citation omitted)).

In determining whether the Government may regulate particular employee speech, the Court must first determine whether the prohibited speech touches upon a matter of public concern and, if the answer is in the affirmative, the Court must then "'balance . . . the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Connick v. Myers*, 461 U.S. 138, 140 (1983) (quoting

12

*Pickering*, 391 U.S. at 568).   If the Court further determines that the government regulation took the form of a prior restraint of speech, as opposed to a *post hoc* disciplinary action, the Court must also weigh the interests of the public and all affected employees against the State's interests.  *Nat'l Treasury Employees Union*, 513 U.S. at 466-68.

### 1. A Matter of Public Concern?

When, as in this case, the material facts are undisputed, it is a question of law for the Court to decide whether Firenze "was both (1) speaking about a matter of public concern and (2) speaking as a citizen." *Foley v. Town of Randolph*, 598 F.3d 1, 5 and n. 7 (1 Cir., 2010); *Curran v. Cousins*, 509 F.3d 36, 44-5 (1 Cir., 2007).  Whether the forbidden speech touches upon a matter of public concern "must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48 (footnote omitted); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 761 (1985); *Rosado-Quinones v. Toledo*, 528 F.3d 1, 5 (1 Cir., 2008). While the Supreme Court has acknowledged that in the context of public employee speech, "the boundaries of the public concern test are not well defined," nevertheless certain "guiding principles" aid in the analysis:

13

> Speech deals with matters of public concern when it
> can be fairly considered as relating to any matter of
> political, social, or other concern to the community or
> when it is a subject of legitimate news interest; that is,
> a subject of general interest and of value and concern
> to the public.

*Snyder v. Phelps*, _ U.S. _, 131 S. Ct. 1207, 1216 (2011) (internal citations and quotation marks omitted).

Certain types of speech are easily classified as either touching upon a matter of public concern, or merely addressing personal grievances and thus classified as private speech. *Compare Pickering*, 391 U.S. at 569 -70 (teacher's open letter criticizing school board's spending was clearly a contribution to the public debate and a matter of public concern) *and Connick*, 461 U.S. at 149 (assistant district attorney's concern over apparent pressure from superior to support certain political campaigns was a matter of public concern) *with Rosado-Quinones*, 528 F.3d at 5 ("The content of Rosado's speech, as embodied . . . in his original Superior Court complaint, is dispositive here. That complaint, replete with implications that [Puerto Rico Police Department] personnel held personal animosity toward Rosado, does not even approach matters of inherent public concern in the context of law enforcement, such as official malfeasance, abuse of office, and neglect of duties.") (internal citation and quotation marks

omitted) *and Tang v. State of R.I., Dep't of Elderly Affairs*, 163 F.3d 7, 12 (1 Cir., 1998) (plaintiff's grievances that she had been erroneously placed on leave, relocated to a new floor, and forced to share a computer did not address matters of public concern but instead were "all individual personal complaints about working conditions."). At times, greater inquiry into the context and form of the speech is required. *Fabiano v. Hopkins*, 352 F.3d 447, 453-55 (1 Cir., 2003).

In this case, Firenze's question to his supervisor was: "Does this mean I cannot tell people who deal with us that I have been suspended?" (#53- 2) The plaintiff was advised that he was prohibited from "communicat[ing] in any way about any discipline by the Agency with parties, lawyers, other representatives, and witnesses to your cases or other members of the public who contact the NLRB about NLRB matters." (#53-2) In response, Firenze stated "I understand . . . that I am not to speak about my discipline to parties and representatives in my current cases." (#53- 2) Although the prohibited subject matter and recipients of potential communications are delineated and narrowly tailored based upon the information that the plaintiff had provided to Pye, given the circumstances it is unknown precisely what Firenze's speech would have been.

To the extent that the potential speech would have related only to the fact that the plaintiff had been disciplined and not any of the underlying circumstances, such speech would plainly not have touched on a matter of public concern.

The Court rules that Firenze's intended speech does touch on a matter of public concern. The majority of Firenze's grievances stemmed from an ongoing personal and professional disagreement the plaintiff had with his supervisor, Regional Director Pye. Any statement that Firenze would have made regarding his first, second, third, fifth, or sixth grievances do not address a matter of public concern. Each of those grievances dealt only with an issue personal to Firenze, and contested discipline received regarding Firenze's work and/or attitude specifically.

The conduct underlying the first grievance was a dispute between Firenze and Pye over whether a case on which the plaintiff had been working was time-barred. Underlying the second grievance was Firenze's annual appraisal which gave him a low rating to reflect his various disagreements with Pye and other NLRB employees. The third grievance relating to the three-day suspension arose due to statements Firenze had made to an NLRB "client" that Pye had deemed improper and in violation of confidentiality rules. The conduct underlying the fifth and sixth grievances were, again, personal disputes between

16

Pye and Firenze, and his alleged disrespectful behavior towards a supervisor.

Any speech about all five of the grievances would have been "about an immediate superior," as they all involved discipline imposed on Firenze by supervisors, or otherwise indicated a personal dispute between the plaintiff and Pye. *See Connick*, 461 U.S. at 148-51; *Pickering*, 391 U.S. at 569-70. "Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Garcetti,* 547 U.S. at 421-22. Moreover, Firenze's speech would have tended to threaten harmony among co-workers in the NLRB's Region One office, where loyalty and confidence are essential among attorneys. *See Rankin v. McPherson*, 483 U.S. 378, 390-92 (1987) (noting that the plaintiff did not stand in a position of confidence); *Connick*, 461 U.S. at 148-51 (emphasizing that the defendant, a district attorney, depended on a high level of loyalty and confidence in his ADAs). There is no public or news interest in the quarrels of a NLRB attorney and his supervisor. *Pickering*, 391 U.S. at 569-70.

Firenze's disagreements with Pye are inherently a problem personal in nature and therefore any intended speech would fail to allege a system-wide issue. *See Saulpaugh v. Monroe Cty. Hosp.*, 4 F.3d 134, 143 (2 Cir., 1993), *cert. denied,* 510 U.S. 1164 (1994) (finding that the plaintiff's speech alleging that her superior sexually harassed her would have been a matter of public concern had it alleged a system-wide, rather than personal, problem). Lastly, although it is permissible for the speaker to be motivated by both personal and public concerns, from all appearances, Firenze's intended speech about his first, second, third, fifth, and sixth grievances manifestly were motivated by his own interests in venting, defending his position, and possibly "gather[ing] ammunition for another round of controversy with [his] superiors." *Connick*, 461 U.S. at 148; *Fabiano*, 352 F.3d at 455; *Putnam v. Town of Saugus, Mass.*, 365 F. Supp.2d 151, 170-71 (D. Mass., 2005). Any such speech is more accurately characterized as complaints about the workplace than as speech made by a citizen intending to contribute to public discourse. Further, the intended speech, as, for example, his contention that a case was time-barred, would have been made as part of his official duties as an NLRB attorney. The Supreme Court has held "that when public employees make statements

pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421.

The plaintiff's potential speech about his fourth grievance requires a closer inquiry. According to the record, on January 9, 2010, Firenze "sent an unsolicited e-mail from [his] NLRB account to" on Marshall Babson, "a former Member of the National Labor Relations Board, now an attorney in private practice." (#59, Ex. D)  At the time the email was sent, Attorney Babson was serving as counsel of record for a party opposing the NLRB in a case before the Supreme Court, *New Process Steel v. NLRB*. (#59, Ex. D)  In the email, Firenze directed Attorney Babson to consider a certain NLRB case, *DLC Corp., d/b/a/ Tea Party Concerts and/or Live Nation*, 353 NLRB No. 130 (March 31, 2009), in which the plaintiff had been the hearing officer whose decision was reversed by the Board. (#59, Ex. D)  According to Firenze, "in e-mailing Mr. Babson, [he claimed to be] reporting to an officer of the court the abuse of authority constituted by a two-member Board voting to set aside the election in *DLC Corp*. for 'institutional reasons,' which [he] believe[d] to be a denial of due process." (#59, Ex. D)

Regional Director Pye advised Firenze that "[a]s a Board Agent, particularly as the hearing officer in *DLC Corp.*, it is inappropriate for you to provide legal advice to a private party to bolster its arguments in Board or court proceedings," and, "your actions were particularly inappropriate in that you provided Mr. Babson legal advice on how to litigate against the NLRB." (#59, Ex. D)  Firenze's conduct was viewed as a violation of the policy set forth in the Casehandling Manual to the effect that Board Agents are not to give legal advice. (#59, Ex. D)  Debunking the plaintiff's claim that he was whistleblowing by reporting an alleged "abuse of the Board's authority to Mr. Babson as 'an officer of the court,'" Pye stated that Firenze was "not 'disclosing' the practice of using a two-member Board.  The two-member Board issue is known and evident to the public and is, in fact, the subject of the *New Process Steel* case." (#59, Ex. D)  Regional Director Pye concluded:

> Your e-mail to Mr. Babson does not reveal any abuse to an officer of the court, but is instead legal advice to opposing counsel . . . . As to your contention that you were engaged in free speech and First Amendment activity, while that may be true of your statement in other contexts, in this instance, where you used your NLRB e-mail account to communicate with counsel opposing the Board in upcoming Supreme Court litigation, appearing to supply an argument for use in that advocacy, you were not engaged in free speech or

First Amendment activity.

#59, Ex. D.

In all the circumstances, the Court is of the opinion that Firenze's potential speech did not address a matter of public concern.  The plaintiff, an NLRB attorney, emailed legal advice on his NLRB email to an individual attorney.  The action of giving legal advice on NLRB matters was within the scope of his employment.  Firenze had been cautioned in the past "about improperly speaking to opposing counsel" and "that supplying aid to opposing counsel is unacceptable." (#59, Ex. D)  "Employers have heightened interests in controlling speech made by an employee in his or her professional capacity. Official communications have official consequences, creating a need for substantive consistency and clarity. Supervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission." *Garcetti*, 547 U.S. at 422-23.  Providing legal advice to an adversary of the NLRB would plainly not "promote the employer's mission" and would pose a significant risk to inter-office harmony. Moreover, Firenze could well be viewed as a disgruntled employee given that the Board overruled his decision, disagreeing with his view of the law.

## 2. Speaking as a Citizen?

Alternatively, even if Firenze's fourth grievance could be viewed as touching on a matter of public concern, the plaintiff would not have been speaking as a citizen.

The issue in many public employee speech cases is whether the employee in fact spoke as a citizen commenting upon a matter of public concern, or whether the speech is more accurately characterized as the grievances of a disgruntled employee. *See Connick*, 461 U.S. at 146-48; *Garcetti*, 547 U.S. at 420. "[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick*, 461 U.S. at 147. To hold otherwise would cast every employee criticism of a public official as a constitutional issue and would transform each public office into "a roundtable for employee complaints over internal office affairs." *Id.* at 149; *see Garcetti*, 547 U.S. at 420 ("Underlying our cases has been the premise that while the First Amendment invests public employees with certain rights, it does not

22

empower them to 'constitutionalize the employee grievance.'") (quoting *Connick*, 461 U.S. at 154).   That being said, the Court has repeatedly emphasized the public value in permitting government employees to voice "informed opinions as to the operations of their public employers," and the resulting harm to public discourse when such informed opinions are suppressed. *City of San Diego, Cal. v. Roe*, 543 U.S. 77, 82 (2004); *see Garcetti*, 547 U.S. at 419-20.

While the context and form of a given statement are relevant to determining whether it touches upon a matter of public concern, content is "pre-eminent." *Davignon v. Hodgson*, 524 F.3d 91, 101 (1 Cir.) (citing *O'Connor v. Steeves*, 994 F.2d 905, 914 (1 Cir., 1993)), *cert. denied*, 555 U.S. 1069 (2008). If based on content alone the speech clearly touches upon a matter of public interest, inquiry into context and form is unnecessary. *Id.*

Several factors provide guidance in determining whether the speech was made by the employee as a citizen contributing to public discourse, or instead as a discontent employee complaining about employment conditions.   The "manner, time, and place" of the speech are clearly relevant, as an off-the-clock statement may be viewed as less disruptive to the government employer than

one made at the office or during the work day. *Connick*, 461 U.S. at 153 (internal citation omitted); *Davignon*, 524 F.3d at 104. Other relevant factors may include whether the speech was: directed at or about an immediate superior; threatened harmony among co-workers where loyalty and confidence are essential to carrying out their public service; made to a public audience or instead muttered to a co-worker; or alleged a system-wide problem or an issue strictly personal in nature. *See Connick*, 461 U.S. at 148-51; *Pickering*, 391 U.S. at 569-70; *Davignon*, 524 F.3d at 104. Courts also look "to whether the community has in fact manifested a legitimate concern in the inner working of the particular agency," or instead whether the speech merely reflects internal interests. *Fabiano*, 352 F.3d at 454 (internal citation and quotation marks omitted).

The speaker's motivation becomes relevant when content is not dispositive. *Fabiano*, 352 F.3d at 454; *see Rankin*, 483 U.S. at 380-81 (employee's statement, after hearing of failed assassination attempt on President Reagan, that "if they go for him again, I hope they get him" addressed a matter of public concern where context showed that the comment was made during a discussion about the administration's policies); *Connick*, 461 U.S. at 148

(prosecutor's questionnaire circulated to co-workers inquiring about office morale, complaint procedures, and confidence in supervisors directly after she opposed a transfer was, in context, merely an attempt to "gather ammunition for another round of controversy with her superiors" and was not intended to inform the public); *Fabiano*, 352 F.3d at 455 (employee's lawsuit against the city's zoning board touched on a matter of public concern because although the employee was motivated by his own property interests, context shows that he was also motivated to "restore the integrity of the zoning process and remedy parking congestion").

That the speaker may have had personal motives to make the speech does not automatically end the analysis. *Fabiano*, 352 F.3d at 455 ("There is no doubt that Fabiano's lawsuit was motivated in large part by self-interest. . . . Nonetheless, we think that Fabiano's Zoning Board lawsuit had sufficient public dimension to ground a First Amendment claim."); *Putnam*, 365 F. Supp.2d at 170-71. However, when context reveals that the employee's speech was a personally motivated complaint about a supervisor or working condition that made no contribution to public discussion, the speech may properly be restricted as private speech. *See Connick*, 461 U.S. at 148 ("We view the

questions...as mere extensions of Myers' dispute over her transfer. . . . Myers did not seek to inform the public that the District Attorney's office was not discharging its governmental responsibilities."); *Rosado-Quinones*, 528 F.3d at 5-6 (officer's lawsuit stemmed from police department's decision to remove his gun and demote him and thus was a classic example of personally motivated speech concerning internal working conditions affecting only the speaker) (internal citation and quotation marks omitted)).

The Court is of the opinion that Firenze was not acting as a citizen when he offered legal advice to an NLRB adversary via an email from his NLRB account. The plaintiff was not attempting to contribute to the public discussion of an issue. Rather, the subject email was sent to an individual attorney with the content of the communication suggesting that the attorney consider a case in which the recommendations made by Firenze as the hearing officer had been reversed by the Board. Firenze was not commenting on the inner workings of his agency. Given that he provided a case citation to Attorney Babson, the *DLC Corp*. decision to which he referred presumably was publicly available and, as Regional Supervisor Pye noted, the use of two-member Boards was widely known. What the plaintiff was providing was his legal analysis of the *DLC Corp*.

decision.

To summarize, Firenze, acting as an NLRB attorney, was providing his legal interpretation of a particular NLRB case to another attorney. In doing so, he was not acting as a private citizen. As a consequence, "the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Curran*, 509 F.3d at 45 (internal citations and quotation marks omitted). The plaintiff's motion for summary judgment should be denied.

## B. Defendant's Motion for Summary Judgment

### 1. Issues Decided, supra

For the reasons stated with regard to the plaintiff's motion, if the majority of Firenze's intended speech is private in nature and accurately characterized as the desire of an employee to air a personal dispute with a supervisor. Firenze's intended speech about his first, second, third, fifth, and sixth grievances was a matter of personal, not public, concern. The Court has ruled that any potential speech about the fourth grievance would not be of public concern in the circumstances.

Also, for the reasons previously stated, if potential speech about the fourth grievance could be viewed as a matter of public concern, Firenze would not

have been speaking as a private citizen.

## 2. Balancing

Even if it were the case that Firenze was speaking on a matter public concern as a private citizen *vis-a-vis* the fourth grievance such that the speech would have been afforded First Amendment protection, "the court must then 'balance ... the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Curran*, 509 F.3d at 44 (quoting *Pickering*, 391 U.S. at 568).

Under the *Pickering-Connick* line of cases, "the state's burden in justifying a particular [action] varies depending upon the nature of the employee's expression." *Connick*, 461 U.S. at 150. Thus, if the speech bears a relatively weak connection to a matter of public concern, the Government's burden in justifying the restriction is lower, while the Government would be required to assert a more significant harm to restrict speech that addresses a matter of obvious public concern, such as racial discrimination. *See Connick*, 461 U.S. at 150; *Fabiano*, 352 F.3d at 455.

By its terms, the *Pickering-Connick* balancing test is "only applicable where

the employee has been punished after speaking in an *ad hoc* disciplinary action."
*Int'l Assoc. of Firefighters Local 3233 v. Frenchtown Charter Twp.*, 246 F.
Supp.2d 734, 740 (E.D. Mich., 2003); *see Kessler v. City of Providence*, 167 F.
Supp.2d 482, 485-86 (D.R.I., 2001).   Thus, *Pickering-Connick* balancing
typically comes into play when a former government employee sues under 42
U.S.C. § 1983 alleging that he or she was wrongfully terminated for making
protected speech. *See, e.g.*, *Connick*, 461 U.S. at 141; *Rankin*, 483 U.S. at 383;
*Fabiano*, 352 F.3d at 45.

When the Government instead imposes a prior restraint of speech
prohibiting the employee from ever uttering the speech, the Court applies the
test set out in *United States v. Nat'l Treasury Employees Union* (*NTEU*), 513 U.S.
454, 466-68 (1995). *See Firefighters*, 246 F. Supp.2d at 740 ("When, in contrast,
the restriction on speech takes the form of a pre-speech threat of punishment
that deters employees from engaging in the speech, the proper test is the more
stringent one elucidated in *NTEU*."); *Kessler*, 167 F. Supp.2d at 487-88.   Prior
restraints of speech bear a heavier presumption of unconstitutionality because
by chilling potential speech, they tend to be both overinclusive and
underinclusive and therefore are disfavored. *NTEU*, 513 U.S. at 468; *Kessler*,

29

167 F. Supp.2d at 485.

The *NTEU* test, in which the Court balances "the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression [against the] expression's 'necessary impact on the actual operation' of the Government," is harder on Government than the *Pickering-Connick* test in two ways. *NTEU*, 513 U.S. at 455 (quoting *Pickering*, 391 U.S. at 571)*; Firefighters*, 246 F. Supp.2d at 740.  First, unlike under the *Pickering-Connick* balancing test where the only interest weighed against the Government is that of the employee in speaking, the *NTEU*  test balances the Government's interests against the "combined interest of *all* employees whose speech is restricted by the rule *plus* all members of the public who would have an interest in hearing the restricted speech." *Firefighters*, 246 F. Supp.2d at 740 (emphasis in original).  Second, while *Pickering-Connick* requires only that the Government show how the speech may have affected the agency's efficient service of the public, *NTEU* requires a showing that the restricted speech would have had a necessary impact on the actual operation of government, meaning that "the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material

way." *Id.* (internal citation and quotation marks omitted).

Cases involving prior restraints of speech imposed on government employees have typically involved wide-reaching ordinances or statutes that prohibit an entire class of workers from speaking. *See NTEU*, 513 U.S. at 477 (honoraria ban imposed a prior restraint of speech by prohibiting all executive branch employees below GS-16 from accepting compensation for speeches, appearances, and literary works); *Firefighters*, 246 F. Supp.2d at 735 (combination of town ordinance and fire department personnel policy had the effect of prohibiting all department members from speaking to the media or public about fire department affairs was a prior restraint of speech); *Kessler,* 167 F. Supp.2d at 485 (Providence Police Department's ordinance constitutes a prior restraint of speech by requiring that all department members obtain permission before giving interviews about the department, speaking on matters of private interest to the department, or speaking on public matters that may disturb the workplace).

The NLRB argues that this is not a prior restraint case.  Here, the NLRB responded to an inquiry from the plaintiff and attempted to craft a response based on the somewhat amorphous information provided by Firenze.  There are

31

no wide-reaching ordinances or statutes at issue. There is no broad group of individuals affected by the prohibition. By its terms, the restraint imposed by the NLRB is limited to the plaintiff's potential speech about "any discipline by the agency with parties, lawyers, other representatives, and witnesses to your cases or other members of the public who contact the NLRB about NLRB matters." (#53-2) Moreover, the door was left open for further discussion "[i]f a specific situation arises." (#53-2)

According to the NLRB, if any balancing should be undertaken, the *Pickering* test should be utilized. Applying this balancing test, the NLRB's interest in effectuating the National Labor Relations Board Act (the "Act") outweighs Firenze's interest in making the speech. *Pickering*, 391 U.S. at 568; *Connick*, 461 U.S. at 142. The NLRB's asserted interests, effectively carrying out the Act and maintaining integrity with those who do business with the NLRB, sufficiently justify prohibiting Firenze from discussing his fourth grievance. This is supported by the fact that Firenze requested to discuss his grievances with parties doing business with the NLRB. Speech suggesting the plaintiff's personal opinion that the NLRB operates as a "denial of due process," when made to individuals who do business with the NLRB, will almost invariably threaten the

NLRB's integrity and ability to carry out the Act.

Firenze asserts that this is a prior restraint case and that the more stringent balancing test set out in *NTEU* and *Firefighters* must be applied. Even under that test, however, the potential speech's necessary impact on the NLRB's operation outweighs the combined interests of all affected employees in making the speech, and the interest of the public in hearing the speech. *See NTEU,* 513 U.S. at 468; *Firefighters*, 246 F. Supp. 2d at 740. Again, Firenze is the only employee affected by the restriction. As stated, the potential negative impact on the NLRB's operations from Firenze, as an NLRB attorney, discussing what he alleged to be a "denial of due process" with parties doing business with the NLRB is real and not "merely conjectural." *Firefighters*, 246 F. Supp.2d at 740 (ban merely conjectural because ordinance which prohibited all department members from discussing anything department related overinclusive and banned innocent speech). Second, Firenze has not demonstrated a manifested public desire to hear the speech, i.e., his legal analysis of an NLRB decision, and common sense dictates that such desire is relatively low. *See NTEU*, 513 U.S. at 477 (honoraria ban on all executive branch employees below GS-16 deprived the public of meaningful contribution); *Firefighters*, 246 F. Supp.2d at 735

(ordinance prohibiting all fire department members from discussing anything

related to the department clearly encompassed matters of true public concern,

such as safety measures).        While NLRB employees have a legitimate interest

in engaging in speech that contributes to public discourse, the speech prohibited

here, discussion of Firenze's fourth grievance, does not bear a strong enough

connection to a legitimate public interest to overcome the NLRB's concrete

interests in maintaining integrity and effectiveness. *See Connick*, 461 U.S. at 146

(racial discrimination is a matter of strong public concern) (citing *Givhan v.*

*Western Consolidated School District*, 439 U.S. 410 (1979)).   It is beyond cavil

that the defendant has a significant interest in prohibiting its attorney

employees in the course of their employment from providing legal advice to

NLRB adversaries in litigation, and that the agency undeniably would suffer

actual harm if such speech were to be permitted.   If the potential speech

addressed a matter of public interest at all, that issue was less clearly a matter

of public concern.  The interests of NLRB employees in making such speech are

weaker and overcome by the need of the NLRB to control the words of their

employees in a manner similar to that of private employers. *See Garcetti*, 547

U.S. at 418-19 (stating that government employers have an even stronger

interest than private employers in regulating employee speech because of the trusted positions in society which government employees typically occupy).

The overinclusiveness concern in many prior restraint cases is simply not present here, as the NLRB's prohibition was tailored to Firenze's suspensions, not directed at a broad group of employees and endless topics of discussion. *See NTEU*, 513 U.S. at 477 (ban reached all executive branch employees below GS-16); *Kessler*, 167 F. Supp.2d at 485-86 (ban on all police department personnel). Similarly, the audience to which the prohibition applies is limited to "parties, lawyers, other representatives, and witnesses to your cases or other members of the public who contact the NLRB about NLRB matters." (#53-2) Thus, the concerns that generally arise in prior restraint cases are not present in the case at bar.

In short, under either the *Pickering-Connick* or *NTEU* balancing tests, the NLRB's interests in suppressing the speech outweigh those of Firenze in making it. For all of the reasons stated, the NLRB's motion for summary judgment should be allowed.

## V. Conclusion

For all of the above-stated reasons, I RECOMMEND that the Plaintiff's

Motion For Summary Judgment (#47) be DENIED.  I FURTHER RECOMMEND

that Defendant NLRB's Motion For Summary Judgment (#57) be ALLOWED.

I RECOMMEND that Final Judgment enter accordingly.

### V. Review by the District Judge

The parties are hereby advised that any party who objects to these

recommendations must file a specific written objection thereto with the Clerk

of this Court within 14 days of the party's receipt of this Report and

Recommendation.  The written objections must specifically identify the portion

of the recommendations, or report to which objection is made and the basis for

such objections.  The parties are further advised that the United States Court of

Appeals for this Circuit has repeatedly indicated that failure to comply with Rule

72(b), Fed. R. Civ. P., shall preclude further appellate review.  *See Keating v.*

*Secretary of Health and Human Services*, 848 F.2d 271 (1 Cir., 1988); *United*

*States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1 Cir., 1986); *Scott v. Schweiker*,

702 F.2d 13, 14 (1 Cir., 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1

Cir., 1982); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1 Cir., 1980);

*see also Thomas v. Arn*, 474 U.S. 140 (1985).

*/s/ Robert B. Collings*

ROBERT B. COLLINGS
United States Magistrate Judge

January 8, 2014.